144 F.3d 391
 126 Ed. Law Rep. 633
 CLEVELAND HEIGHTS-UNIVERSITY HEIGHTS CITY SCHOOL DISTRICT,
Petitioner-Appellant/Cross-Appellee,
v.
Sommer BOSS By and Through her parents, Robert and Donna
BOSS, Respondent-Appellee/Cross-Appellant.
 Nos. 96-4333, 96-4376.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 6, 1998.
Decided May 6, 1998.
 
 Susan C. Hastings (argued and briefed), Brian T. Robinson (briefed), Squire, Sanders & Dempsey, Cleveland, OH, for Petitioner-Appellant/Cross-Appellee.
 Ellen L. Foell (argued and briefed), Cleveland Heights, OH, for Respondent-Appellee/Cross-Appellant.
 Before: MERRITT, KENNEDY, and BOGGS, Circuit Judges.
 OPINION
 BOGGS, Circuit Judge.
 
 
 1
 The Cleveland Heights-University Heights School District ("the District"), appeals a decision of the district court affirming the ruling of an Ohio State Level Review Officer ("SLRO") finding that the District violated the Individuals with Disabilities Education Act ("IDEA") and was required to reimburse Sommer Boss's family for expenses associated with Sommer's attendance at a private school for the 1994-95 school year. The Boss family cross-appeals, seeking to reverse the district court's rulings that the SLRO properly denied them reimbursement for expenses associated with Sommer's attendance at a private school for the 1993-94 school year. For the reasons that follow, we find that the District's appeal lacks merit and that we do not have jurisdiction to hear the Boss family's cross-appeal. Accordingly, we affirm the ruling of the district court.
 
 
 2
 * Mr. and Mrs. Boss enrolled their daughter Sommer in kindergarten in the Cleveland Heights-University Heights School District in the fall of 1989, after holding her back for one year on the recommendation of school staff. Shortly after Sommer started school, her kindergarten teacher recommended she undergo evaluation to determine whether she had a speech and/or language disability. Sommer's parents signed a "Notice of Intent to Identify and Evaluate a Student." This form explained the rights of parents in the process of evaluating a student for a disability. By signing the form, Sommer's parents acknowledged that their rights under the IDEA relating to the testing procedure had been explained to them and that they had received a written explanation of their rights. The District subsequently confirmed that Sommer did have a speech and language problem. Consistent with its obligation under the IDEA, the District prepared an Individual Educational Program ("IEP") setting forth ways to address Sommer's speech and language problems. Mr. and Mrs. Boss approved this IEP and it was implemented.
 
 
 3
 The following year, when Sommer was in first grade, another IEP was prepared by the school and approved by Sommer's parents and she continued her speech and language therapy. That same year, Sommer was also placed in a federally-funded reading program called Chapter I, which is not considered special education and was not required by the IEP developed to address her speech and language problems. At the end of her first grade year, Sommer took the Iowa Basic Skills Test and scored in the 15th percentile for reading and the 33rd percentile overall. Sommer's Chapter I progress report for the first grade indicated that her word recognition, reading comprehension, and total reading had improved slightly; that her vocabulary had regressed and that overall she was working at a mid-kindergarten level. Nevertheless, Sommer received "satisfactory pluses" for reading on her report card.
 
 
 4
 The next year, when Sommer was in the second grade, another IEP was developed for her speech and language problems and approved by Mr. and Mrs. Boss. Sommer also continued in the Chapter I program. During her second grade year, Sommer began to get frustrated with school. Her Iowa Test scores declined from the previous year. Sommer's scores placed her in the 21st percentile overall and the 8th percentile in reading. According to Sommer's Chapter 1 reports, she had made modest improvements and her total reading ability was now at an early second grade level, but her reading comprehension was still at a mid-first grade level. On her report card, Sommer received marks indicating that her performance in reading was somewhere between minimal and satisfactory. Concerned about Sommer's test scores and her attitude towards school, Mrs. Boss met with Sommer's second grade teacher and her Chapter I teacher. The teachers recommended that Sommer work with a private tutor over the summer and that the Bosses wait until the following year before deciding whether to have Sommer tested for a learning disability beyond the problem identified with her speech and language.
 
 
 5
 Throughout the summer between her second and third grade years, Sommer worked with a private tutor. By the time Sommer's third grade year began, the District had developed, and her parents had approved, another IEP to address remaining speech and articulation problems Sommer had. Sommer also resumed participation in the Chapter I program. During third grade, Sommer was overwhelmed by the workload and had to take a great deal of work home because she could not complete it during assigned school periods. At the request of Sommer's parents, her teacher reduced her workload. Sommer's Iowa Test scores for her third grade year showed that she was continuing to fall behind her peers. Her overall composite score placed her in the 6th percentile and her reading ranked in the 5th percentile. Her Chapter I reports indicated that her vocabulary and total reading ability had regressed to a mid-first grade level. Despite these indicators, Sommer received a grade of "satisfactory" for reading on her third grade report card.
 
 
 6
 Sommer's parents were alarmed by the decline in her scores and Mrs. Boss met with Sommer's third grade teacher and her principal, Mrs. Moore, to discuss the possibility of home schooling. Mrs. Boss also indicated that she wanted Sommer tested for a learning disability. Mrs. Moore responded by filing a Pupil Services Referral Form. In response to the referral form, a Pupil Services Team consisting of Sommer's third grade teacher, speech pathologist, and reading teacher as well as a school counselor and the school psychologist met with the Bosses to develop an "action plan." The "action plan" called for Sommer to have private tutoring throughout the summer before her fourth grade year, enroll in a reading program at the library and also stated that her progress would be monitored throughout her fourth grade year. The Pupil Services Team also gave the Bosses materials on Attention Deficit Disorder.
 
 
 7
 The District did not get around to testing Sommer for a learning disability before the end of her third grade school year. Without testing by the District, and a finding that she was learning disabled, Sommer could not be admitted to special education programs to address her reading problems. Over the summer, Mr. and Mrs. Boss had Sommer undergo private testing. This testing did not state that Sommer was learning disabled, but did state that she should continue in the Chapter I program and that she was "a very holistic learner and require[d] ... multi-sensory" instruction. Sommer's summer tutor, a learning disabilities teacher from a neighboring school district, advised Mr. and Mrs. Boss that Sommer would not catch up to her peers unless she was admitted to special education programs at her present school or sent to a school that focused on her need for intensive instruction.
 
 
 8
 Over the summer, Mr. and Mrs. Boss researched private schools in the area catering to students with Sommer's need for individualized instruction. In August, Mr. and Mrs. Boss filed an enrollment application and paid a fee to reserve a place for Sommer at the Lawrence School, which was recommended by Sommer's summer tutor. The Bosses then requested a waiver from the District that would permit Sommer to receive special education even though she had not yet been tested and determined to have a learning disability. The District was unable to act on the request for a waiver before school started at the Lawrence School, so the Bosses decided to send Sommer to Lawrence for the 1993-94 school year.
 
 
 9
 In September 1993, the District informed the Bosses that Sommer could still undergo a multi-factored examination ("MFE") to determine whether she had a disability, despite the fact that she was now going to the Lawrence School. The Bosses had Sommer take the MFE. It indicated that she had a specific learning disability. Because Sommer was committed to attending Lawrence for the 1993-94 school year, the Bosses consented to postpone until May 1994 the development of an IEP to address Sommer's reading disability for the following school year.
 
 
 10
 In early May 1994, Mrs. Boss and Sommer's teacher from Lawrence met with District personnel for what they believed was to be a meeting to develop an IEP for Sommer for the following school year. The meeting, however, degenerated into an argument about whether the District had any obligation to develop an IEP for Sommer before the Bosses decided whether Sommer would remain at the Lawrence School for the 1994-95 year or re-enroll in the District. After the District realized that it was obligated under federal law to develop an IEP for Sommer even though she was attending Lawrence, a second meeting was convened on June 2, 1994 to discuss an IEP for Sommer. Following this meeting, an IEP was sent to the Bosses but they refused to approve it because it provided no objective way to measure Sommer's progress,[1] it did not adequately explain the specific services she would receive during the 50% of the school day when she was in a normal classroom setting, and it had her attending a school with a high student-teacher ratio. The District and the Bosses agreed that Sommer should attend another school in the District with a lower student-teacher ratio. However, the dispute over the method for measuring Sommer's progress and other issues regarding the IEP were never resolved and Mr. and Mrs. Boss re-enrolled Sommer at the Lawrence School for the 1994-95 school year.[2]
 
 II
 
 11
 Basing their claim on the IDEA, the Bosses decided to seek reimbursement from the District for expenses associated with sending Sommer to the Lawrence School. The District denied the Bosses' request for reimbursement in September 1994. The Bosses then requested a due process hearing before a state independent hearing officer to determine whether they were entitled to reimbursement for the 1993-94 and 1994-95 school years.
 
 
 12
 A. The Ruling of the Independent Hearing Officer
 
 
 13
 The Independent Hearing Officer ("IHO") determined that the District failed to provide Sommer with a Free Appropriate Public Education ("FAPE"), as required by the IDEA. The IHO further found that the District improperly "ignored indications" of Sommer's learning disability related to reading. Moreover, the IEP the District sent to Sommer's parents before the 1994-95 school year was deemed inadequate under the IDEA. The IHO also determined that the private placement the Bosses selected for Sommer at the Lawrence School was appropriate under the IDEA. Because the District had violated the IDEA by failing timely to identify Sommer's reading disability and by providing an inadequate IEP once the disability was identified, the District was ordered to reimburse the Bosses for expenses related to Sommers's attendance at Lawrence for both the 1993-94 and 1994-95 school years.
 
 
 14
 B. The Ruling of the State Level Review Officer
 
 
 15
 The District appealed the IHO's ruling to the State Level Review Officer ("SLRO"). In reviewing the IHO's ruling, the SLRO made several combined findings of fact and conclusions of law. The SLRO determined that the District had no reason to believe Sommer might have a learning disability handicap related to reading because she was making progress in the Chapter I program each year and displayed no "severe discrepancy between her achievements and her ability." According to the SLRO, Sommer's declining Iowa Test scores were "just one factor and [as] such not dispositive of [her] progress or lack thereof." The SLRO also found that the District afforded Sommer and her parents all of the rights to which they were entitled, but that the IEP the District developed for the 1994-95 was inadequate and that the District refused to consider "altering the proposed IEP until November 1994." Since the proposed IEP was inadequate, the SLRO concluded that the District had failed to provide Sommer with a FAPE for the 1994-95 school year and her parents decision to place her at the Lawrence School for that year was appropriate. Pursuant to these findings, in a ruling issued on September 27, 1995, the SLRO upheld the IHO's order that the District reimburse the Bosses for the 1994-95 school year, but reversed the IHO's order that the District reimburse the Bosses for the 1993-94 school year.
 
 C. The Ruling of the District Court
 
 16
 On October 17, 1995, the District filed an action in the United States District Court for the Northern District of Ohio, challenging the SLRO's ruling as to the 1994-95 school year. On December 19, 1995, the Bosses filed a cross-appeal challenging the SLRO's ruling as to the 1993-94 school year. The District moved to dismiss the Bosses' cross-appeal as untimely. The district court denied the District's motion to dismiss the cross-appeal. The Bosses then filed a motion for summary judgment to reverse the SLRO's denial of reimbursement for the 1993-94 school year and a motion for summary judgment to affirm the SLRO's award of reimbursement for the 1994-95 school year. The District filed cross-motions for summary judgment, seeking to uphold the SLRO's ruling as to the 1993-94 school year and to reverse the SLRO's ruling as to the 1994-95 school year. As to the 1993-94 school year, the district court granted the District's motion to affirm the SLRO's ruling denying reimbursement and denied the Bosses' motion to reverse it. The district court did, however, grant the Bosses' motion to uphold the part of the SLRO's ruling requiring reimbursement for the 1994-95 school year and denied the District's motion to reverse it.
 
 III
 
 17
 The Bosses filed a timely appeal to this court challenging the district court's grant of summary judgment affirming the SLRO's denial of reimbursement for the 1993-94 school year. The District also filed a timely appeal to this court challenging the district court's denial of their motion to dismiss as time-barred the Bosses' cross-appeal challenging the SLRO's ruling as to the 1993-94 school year and the district court's grant of summary judgment upholding the SLRO's ruling regarding 1994-95 school year.
 
 
 18
 A. The Bosses' Cross-Appeal Relating to the 1993-94 School Year is Time-Barred
 
 
 19
 Below, the District argued that the Bosses' cross-appeal challenging the SLRO's denial of reimbursement for the 1993-94 school year was time-barred because it was filed seventy-eight days after the SLRO's ruling and under Ohio Revised Code section 3323.05(F)[3] it had to be filed within forty-five days. Before, the district court, the Bosses argued that under this court's decision in Janzen v. Knox Cty. Bd. of Educ., 790 F.2d 484 (6th Cir.1986), O.R.C. § 3323.05(F) is not the statute of limitations applicable to their cross-appeal. The district court agreed with the Bosses.[4] We, however, do not.
 
 
 20
 We review de novo the district court's determination of the applicable statute of limitations. Sierra Club v. Slater, 120 F.3d 623, 630 (6th Cir.1997). In Janzen, 790 F.2d at 486, we recognized that the IDEA, like 42 U.S.C. § 1983, provides no statute of limitations for actions brought under it. Consistent with the approach used to determine the statute of limitations for actions brought under section 1983, in Janzen we sought to determine what Tennessee statute of limitations was most appropriate to apply to actions pursuant to the Education of All Handicapped Children Act "EAHCA" (subsequently renamed the Individuals with Disabilities Education Act, or "IDEA"). Id. at 485-86.
 
 
 21
 In Janzen, however, we realized that the analogy to section 1983 was inapposite. The court could not determine one state statute of limitations applicable to all actions brought under the IDEA, as the Supreme Court had done for section 1983 actions in Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Id. at 487. This is because, whereas actions brought under section 1983 are always most analogous to some type of state tort action, there is no one state law cause of action that neatly encompasses the various actions that can be brought under the IDEA, which range from actions for reimbursement for a private placement to challenges to the propriety of an IEP. Ibid. Since no one cause of action is analogous to all of the variety of suits that can be brought under the Act, we held in Janzen that it was inappropriate to apply a state's statute of limitations for one specific cause of action to every case brought under the IDEA. Therefore, we held that the state statute of limitations applicable to actions under the IDEA had to be determined on a case-by-case basis in light of the nature of the action, as well as the facts, circumstances, and procedural posture of the case. Ibid. After stating this broad proposition in Janzen, our court proceeded to determine the state statute of limitations applicable to that case.
 
 
 22
 Janzen was not an appeal from an administrative ruling. Id. at 486. Rather, it was an original action under the IDEA filed in federal district court by parents seeking reimbursement from a Tennessee public school district for the cost of private school for their handicapped son. Id. at 485. We considered five Tennessee statutes of limitations that could be applied to the action. Id. at 487. The sixty-day limitations period for appeals from rulings from any state administrative agency was rejected because the case was an original action and the plaintiffs "had no ruling of any kind from which to appeal." Ibid. It was also unacceptable because it provided a more deferential standard of review than that mandated by the IDEA. Ibid. We eventually decided that under Tennessee law the best statute of limitations to apply to the plaintiffs' original action for reimbursement was the three-year limitations period provided for property tort actions because it "applies to actions for money owed for personal services rendered" and the plaintiffs' reimbursement claim was "in the nature of a claim for subrogation for personal services rendered."[5] Id. at 489.
 
 
 23
 The present case is different from Janzen in two decisive ways. First, it is an appeal from an administrative appeal, not an original action. Furthermore, this case arose in Ohio, and Ohio has a statute of limitations--O.R.C. § 3323.05(F)--specifically for appeals from SLROs in actions under the IDEA and Ohio's parallel law. See Cremeans v. Fairland Local Sch. Dist., 91 Ohio App.3d 668, 633 N.E.2d 570, 576 (1993). Furthermore, unlike the statute in Janzen pertaining to appeals of any administrative rulings, O.R.C. § 3323.05(F) provides for the same standard of review mandated by the IDEA. See ibid. We also note that other circuits have applied similar education-specific state statutes of limitations to appeals from state administrative rulings on IDEA claims. See, e.g., Livingston Sch. Dist. v. Keenan, 82 F.3d 912, 916 (9th Cir.1996) (applying Montana's 30-day limitation period); Dell v. Board of Educ., 32 F.3d 1053, 1060 (7th Cir.1994) (applying Illinois's statute).[6]
 
 
 24
 We see no reason not to follow suit in this case and apply O.R.C. § 3323.05's forty-five day limitations period. Because the Bosses' cross-appeal of the SLRO's ruling regarding the 1993-94 school year was filed in the district court seventy-eight days after the decision was issued, it was indeed untimely. Therefore, the district court did not, and we do not, have jurisdiction to review the SLRO's ruling denying the Bosses reimbursement for the 1993-94 school year.
 
 
 25
 B. Reimbursement for the 1994-95 School Year was Appropriate
 
 
 26
 This court reviews a district court's review of an administrative ruling in an IDEA case under a "modified de novo" standard. Doe v. Metropolitan Nashville Public Sch., 133 F.3d 384, 386 (6th Cir.1998). Consistent with the Supreme Court's guidance in Board of Educ. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 3050-51, 73 L.Ed.2d 690 (1982), we have interpreted this standard to require that courts give "due weight to the state administrative proceedings in reaching [their] decision." Doe, 133 F.3d at 386.
 
 
 27
 The IDEA requires the District to provide handicapped children, such as Sommer, with a free appropriate public education ("FAPE"). Rowley, 458 U.S. at 181, 102 S.Ct. at 3037-38 (1982). To this end, the Act requires that for each disabled student the District develop a curriculum "tailored to the unique needs of the handicapped child by means of an 'individualized educational program' " ("IEP"). Id. at 181-82, 102 S.Ct. at 3037-38. These IEPs must comply with certain requirements enumerated in the IDEA and accompanying federal regulations. See id. at 182, 102 S.Ct. at 3038. In this case, two state administrative review officers and the district court concluded that the IEP that the District developed for Sommer for the 1994-95 school year did not comply with the applicable standards. The District makes three arguments as to why it should not be held liable for reimbursement on the basis of any perceived deficiencies in the IEP that it sent the Bosses in the summer of 1994.
 
 1. The "First Draft" Argument
 
 28
 The District's first argument is that the IEP it sent to the Bosses was just a first draft--a starting point--that would have been further developed and refined before the 1994-95 school year began if the Bosses had continued the dialogue with the District over the summer. The District is correct that under 34 C.F.R. § 300.342(a) it was not required to have an adequate IEP in place for Sommer until the "beginning of ... the [1994-95] school year." This argument fails, however, because, as we pointed out in footnote 2, the administrative review officers found that the District told the Bosses that it had no intention of amending the IEP until November 1994--well after the school year began. Although this was a hotly contested issue, our review of the record does not persuade us that we should disturb this finding.
 
 
 29
 The District's attempt to analogize this case to Doe v. Defendant I, 898 F.2d 1186, 1188 (6th Cir.1990) can also be dismissed quickly. In Defendant I, the school district did not have an adequate IEP in place for the handicapped student at the beginning of the school year because the student's parents asked the school to wait until November to develop an IEP so their child would have an opportunity to adjust to the new experience of middle school "on his own." Id. at 1189. Naturally, the court in Defendant I did not permit the parents to use the fact that the District complied with their wishes as a sword in their IDEA action. In the instant case, however, Sommer's parents did not ask the District to delay preparation of an IEP until after the school year started. Rather, it was the District that indicated it would not take further steps until after the school year started.
 
 2. The Minor Technicality Argument
 
 30
 The District's second argument on appeal is that any shortcomings that may have existed in the IEP they provided the Bosses in the summer of 1994 implicated only a few minor technical matters on a "laundry list" of requirements that were insufficient in number and significance to constitute violations of the IDEA warranting the award of reimbursement to the Bosses. The IDEA provides that an IEP must include:
 
 
 31
 (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific regular educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, ... (E) the projected date for initiation and anticipated duration of such services, and (F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
 
 
 32
 20 U.S.C. § 1401(a)(20). The items in section 1401(a)(20) are requirements by which the adequacy of an IEP is to be judged, although minor technical violations may be excused. Defendant I, 898 F.2d at 1190-91 (explaining Board of Educ. v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)).
 
 
 33
 The state administrative officers and the district court all found that the IEP the District offered the Bosses did not provide appropriate objective criteria for measuring Sommer's progress as required by 20 U.S.C. § 1401(a)(20)(F). We find this conclusion amply supported by the record and find no basis for reversing it, especially under the due weight standard of review we are required to apply, which militates against second guessing the educational expertise of the administrative officers and conclusions predicated upon these expertise. Doe, 133 F.3d at 386. Moreover, this case is not like Defendant I, where we held that predicating liability on a technical violation of the IDEA stemming from the omission from the IEP of a statement of the student's present level of educational performance was improper because it would "exalt form over substance." Defendant I, 898 F.2d at 1191. Our ruling in Defendant I, relied upon the undisputed fact that "the information absent from the IEP was known to all parties." Id. at 1190-91. In this case the violation was far from technical, and its absence was not harmless. The omission went to the heart of the substance of the plan, and thus any analogy to Defendant I fails.
 
 3. The Mainstreaming Argument
 
 34
 The District's final argument begins by correctly noting that a finding that the District violated IDEA is necessary but not sufficient to entitle the Bosses to reimbursement for Sommer's tuition at the Lawrence School. The Bosses must also establish that the placement of Sommer at Lawrence was "proper under the Act [IDEA]." Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 15, 114 S.Ct. 361, 366, 126 L.Ed.2d 284 (1993). It is undisputed that the Lawrence School admits only learning-disabled children. Noting this fact, the District contends that the placement of Sommer was not proper under the IDEA because the Lawrence School cannot satisfy the IDEA's mainstreaming requirement, which mandates:
 
 
 35
 [T]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.
 
 
 36
 20 U.S.C. § 1412(5)(B).
 
 
 37
 The District's argument actually relies upon two related propositions. First, that the mainstreaming requirement applies to parentally selected private placements, and second that the failure of a parentally selected private placement to satisfy the requirement bars reimbursement under the IDEA for the costs of sending a child to the non-complying school. The District's reliance on Gillette v. Fairland Bd. of Educ., 932 F.2d 551(6th Cir.1991) is misplaced because it does not address either of these issues. In that case, the child's IEP, which was deemed adequate, required that he have certain courses in an environment where he would not be with any non-disabled children. Id. at 554. The parents removed the child from the public school, however, and placed him in a private school that admitted only disabled students and then sought reimbursement from the school district on the basis that their public school was not providing a fully mainstreamed program for their child. We rejected the parents' argument that the school district was required to provide a fully mainstreamed environment, explaining that the IDEA requires only that the school district provide an environment that allows the child to participate "as much as possible in the same activities as non-handicapped children." Id. at 554. Gillette therefore rejected the perverse proposition that the IDEA could be interpreted to place the school district in the impossible position of having to comply with an IEP requiring some of the child's education in a nonmainstreamed environment while permitting the parents to place the child in a private school and claim reimbursement based on the school's compliance with IEP's mandate for some non-mainstreamed instruction.
 
 
 38
 No court has yet decided whether the IDEA's mainstreaming requirement can be used to bar reimbursement. However, the Supreme Court has provided guidance in resolving this issue of first impression in two cases that rejected similar arguments that the failure of a parentally selected private placement to comply with provisions of the IDEA bars reimbursement. In Burlington v. Department of Educ., 471 U.S. 359, 372-74, 105 S.Ct. 1996, 2003-05, 85 L.Ed.2d 385 (1985), the Court held that when the school district failed to provide a FAPE, the fact that the parents violated the IDEA's "stay put" provision by removing the child from the public school did not bar them from being reimbursed for the private placement they selected for their child. The Court reasoned that barring reimbursement on this basis would create an anomalous situation where "the parents are forced to leave the child in what may turn out to be an inappropriate educational placement or to obtain the appropriate educational placement only by sacrificing any claim for reimbursement." Id. at 372, 105 S.Ct. at 2003-04. Similarly, in Florence, the Court refused to bar reimbursement because the private placement the parents selected did not comply with the requirements for a FAPE under section 1401(18) of the IDEA in that it did not meet all of the education standards mandated for public schools. 510 U.S. at 13-14, 114 S.Ct. at 365-66. The Court reasoned that imposing such requirements on private placements would "eliminate the right of unilateral withdrawal recognized in Burlington." Ibid.
 
 
 39
 From these cases it is clear that the IDEA was intended to provide both a free and an appropriate education for disabled children and that the Act should not be read to provide one of these benefits at the expense of the other. See Burlington, 471 U.S. at 372, 105 S.Ct. at 2003-04. This is exactly what the District is asking us to do in this case. The District would have us read the IDEA to say, in effect: "If we fail to provide a disabled child with an appropriate education, the parents must pay for a private education, or let their child languish in our institution if the only placement more suitable to her needs and more closely approximating the ideal envisioned by the IDEA than what we offer is a specialized private school that admits only learning disabled students." Congress did not intend to place beneficiaries of the IDEA in the position of having to choose only among these unpalatable alternatives.[7] Accordingly, we hold that the failure of the Lawrence School to satisfy the IDEA's mainstreaming requirement does not bar the Bosses from receiving reimbursement for expenses associated with sending Sommer to Lawrence for the 1994-95 school year.
 
 IV
 
 40
 Because the Bosses' cross-appeal of the denial of reimbursement for the 1993-94 school year was time-barred, the district court lacked jurisdiction to hear an appeal of that portion of the SLRO's ruling. Therefore, we VACATE the district court's grant of summary judgment in favor of the District as to the 1993-94 school year. We AFFIRM the district court's grant of summary judgment in favor of the Bosses awarding reimbursement for the 1994-95 school year.
 
 
 
 [1]
 The IEP stated that Sommer's progress would be measured in terms of her ability to do things such as "identify" a "list of sight words ... with 80% accuracy" and "improve her reading fluency when reading a passage aloud 8/10 times." Beyond such vague and general statements, the IEP offered no basis for measuring Sommer's progress
 
 
 [2]
 Apparently, the Bosses were given the impression that no further amendments would be made to Sommer's IEP until November of the coming school year. The SLRO found that this is what the Bosses were told and the record supports this conclusion
 
 
 [3]
 Section 3323.05(F) provides that any party who had a due process hearing before an IHO regarding the identification, evaluation or educational placement of a disabled child and appeals the IHO's ruling to an SLRO, may appeal "the final order [of the SLRO] within forty-five days of notification of the order to the court of common pleas of the county in which the child's school district of residence is located."
 
 
 [4]
 In denying the District's motion to dismiss the cross-appeal, the district court held that under Janzen the applicable limitations period was not O.R.C § 3323.05(F), but rather, the four-year time period prescribed by O.R.C. § 2305.09 for torts involving trespass, recovery of real property, and fraud
 
 
 [5]
 Apparently, the district court in this case misconstrued the reasoning in Janzen as to why we apply the most analogous state statute of limitations to an action brought under a federal statute with no limitations period. It construed Janzen as stating that a court should derive the proper statute of limitations by considering the proper balance between the value of the policy of repose inherent in a statute of limitations and the value of enforcing the substantive policies embodied in the statutory scheme at issue. Janzen, however, expressly endorses the opposite view that " '[b]y adopting the statute [of limitations] governing an analogous cause of action under state law, federal law incorporates the State's judgement on the proper balance between the policies of repose and the substantive policies of enforcement embodied in the state cause of action.' " Janzen, 790 F.2d at 489 (quoting Wilson v. Garcia, 471 U.S. 261, 271, 105 S.Ct. 1938, 1944, 85 L.Ed.2d 254 (1985)) (emphasis added)
 
 
 [6]
 Although our circuit has noted that the determination of a statute of limitations for IDEA-related actions must be made on a case-by-case basis, taking into account the nature of the action, the possible limitations statutes, and the procedural posture of the case, the relatively short statute applied in this case is not problematic. As other Circuits have noted, it is best to promote a speedy resolution of IDEA-related claims, especially when they have undergone administrative review. Keenan, 82 F.3d at 916-17; Dell v. Board of Educ., 32 F.3d 1053, 1061 (7th Cir.1994). Our preference for a longer limitations period in Janzen was due in large part to the fact that the claim for reimbursement in that case had not previously been subject to any sort of administrative review. Janzen, 790 F.2d at 487
 
 
 [7]
 It will commonly be the case that parents who have not been treated properly under the IDEA, and who exercise the right of parental placement, will place their child in a school that specializes in teaching children with disabilities and thus will not satisfy the mainstreaming requirement. Adopting such a limitation on parental placements would therefore effectively vitiate that remedy