12-1610-cv
*C.L. v. Scarsdale Union Free Sch. Dist.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2012

(Argued: June 19, 2013      Decided: March 11, 2014)
Docket No. 12-1610-cv

————————————

C.L., Individually, G.W., Individually,
and on behalf of C.L., a child with a disability,
*Plaintiffs-Appellants*,

v.

SCARSDALE UNION FREE SCHOOL DISTRICT,
*Defendant-Appellee*.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:
STRAUB, HALL, and CHIN, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the

Southern District of New York (*Seibel, J.*) granting summary judgment to school

district and dismissing claims brought by parents of a disabled child under the

Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, and Section

504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

REVERSED IN PART AND AFFIRMED IN PART.

———————————

JESSE COLE CUTLER, Skyer and Associates, LLP, New York, New York, *for Plaintiffs-Appellants*.

STEPHANIE MARIE ROEBUCK, Keane & Beane, P.C., White Plains, New York, *for Defendant-Appellee*.

Jay Worona and Pilar Sokol, Latham, New York, *for Amicus Curiae New York State School Boards Association, Inc*.

Francisco Maria Negrón, Jr. and Naomi E. Gittins, Alexandria, Virginia, *for Amicus Curiae National School Boards Association*.

Thomas E. Perez, Assistant Attorney General for the Civil Rights Division, Nathaniel S. Pollock and Mark L. Gross, Attorneys, United States Department of Justice, Washington, D.C.; Preet Bharara, United States Attorney for the Southern District of New York, Sarah S. Normand and Lara K. Eshkenazi, Assistant United States Attorneys, New York, New York; and Phillip H. Rosenfelt, Deputy General Counsel, Francisco Lopez and Marcus Hendrick, Attorneys, United States Department of Education, *for Amicus Curiae United States Department of Education*.

———————————

CHIN, *Circuit Judge*:

In this case, C.L., a child with a disability, was denied a free appropriate public education (a "FAPE") by the Scarsdale Union Free School District (the "District"). His parents, plaintiffs-appellants C.L. and G.W., placed him in a specialized private school designed to educate children with learning disabilities and sued the District for tuition reimbursement under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.* An Impartial Hearing Officer ("IHO") awarded tuition reimbursement to C.L.'s parents, holding that the District denied C.L. a FAPE and that the parents' private placement was appropriate. A State Review Officer ("SRO") reversed, agreeing that C.L. was denied a FAPE but holding that the parents' private placement was not appropriate, at least in part because the specialized private school was a more restrictive environment than the public school in which C.L. had been placed. The district court affirmed.

We reverse. We hold that the SRO's decision was insufficiently reasoned to merit deference and we instead defer to the IHO's decision, which was more thorough and carefully considered. The IHO detailed the programs that the parents' placement provided to C.L. and the progress C.L. made there.

The IHO also took into account the school's restrictiveness as one factor in his decision. In contrast, the SRO did not examine the kind of education and services the parents' placement provided C.L., effectively ruling that the school was inappropriate only because it was more restrictive than the public school he previously attended. When a public school district, however, denies a child with a disability a FAPE, a private placement is not inappropriate merely because the environment is more restrictive than the public school alternative. When a child is denied a FAPE, his parents may turn to an appropriate specialized private school designed to meet special needs, even if the school is more restrictive.

The parents also brought a claim under Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794, alleging that the District discriminated against C.L. on account of his disability. The district court granted summary judgment dismissing the claim, concluding that the parents had not presented sufficient evidence of bad faith or gross misjudgment. We affirm the dismissal of the Rehabilitation Act claim.

## BACKGROUND

### A.    Legal Background

The IDEA seeks to provide to all children with disabilities "a free appropriate public education that emphasizes special education and related services."  20 U.S.C. § 1400(d)(1)(A); *see Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181 (1982) (interpreting predecessor statute to IDEA, Education of the Handicapped Act).  States receiving federal funding must provide children with disabilities with a FAPE "tailored to meet the unique needs of a particular child." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citation omitted).  A FAPE must also reflect the IDEA's "'strong preference' for educating disabled students alongside their non-disabled peers; that is, in their least restrictive environment." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 143 (2d Cir. 2013) (citing *Walczak*, 142 F.3d at 122).

The IDEA requires states to create an individualized education program ("IEP") for each disabled child.  *See* 20 U.S.C. § 1412(a)(4); *see also Honig v. Doe*, 484 U.S. 305, 311 (1988) (describing development of IEP as "centerpiece" of IDEA); *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006) (describing IEP as

"[t]he key element of the IDEA").  The IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507-08 (2d Cir. 2006) (internal quotation marks omitted); *see also* 20 U.S.C. § 1414(d)(1)(A).  The IEP must be reviewed at least annually and revised in accordance with the child's needs.  20 U.S.C. § 1414(d)(2), (3), (4).

Where the state fails to provide a FAPE to a disabled child, the parents may enroll the child in a private school and seek reimbursement for the cost of the private school education from the local education agency.  *See* 20 U.S.C. § 1412(a)(10)(C)(i), (ii); *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 370 (1985); *Frank G.*, 459 F.3d at 363.  In New York, which is covered by the IDEA, a parent seeking such reimbursement must first pursue that claim in a due process hearing before an IHO, N.Y. Educ. Law § 4404(1) (McKinney 2006), and may appeal an adverse ruling to an SRO, *id.* § 4404(2).  Either party may then seek review of the SRO's decision in federal court. 20 U.S.C. § 1415(i)(2)(A).

Parents may also seek relief under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), where their child has been subjected to discrimination on account of her disabilities in any program receiving federal financial assistance. As we have noted, "[t]he purposes of the Rehabilitation Act are similar to that of the IDEA." *Muller ex rel. Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 99 n.2 (2d Cir. 1998). There are, however, differences in the two statutes, and an accommodation developed to comply with the Rehabilitation Act is "not an adequate substitute" for an IEP under the IDEA. *Id.* at 105 & n.9; *accord R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 946 (9th Cir. 2007). An individual aggrieved by a violation of the Rehabilitation Act may seek, *inter alia*, compensatory damages. 29 U.S.C. § 794a.

**B.     The Facts**

The relevant facts are largely undisputed. C.L. has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), nonverbal learning disability, and executive function weakness. He has exhibited problems with anxiety, stuttering, fine motor development, and visual motor coordination, all of which inhibit his ability to learn. From the 2004-05 school year to the 2007-08 school year -- kindergarten to third grade -- C.L. attended Greenacres Elementary

School, a public school in Scarsdale, New York, operated by the District. During the fourth year, the 2007-08 school year, C.L.'s parents requested that C.L. be considered for an IEP under the IDEA. After the District determined that he was not entitled to an IEP, the parents enrolled C.L. at the Eagle Hill School, a specialized private school in Greenwich, Connecticut, for the 2008-09 school year.

### 1. The First Three Years at Greenacres

In October 2004, in kindergarten, C.L. began receiving speech-language therapy sessions once a week to address his "episodic dy[sfl]uency." In January 2005, he began receiving pre-reading instruction sessions twice a week in Greenacres's Learning Resources Center ("LRC").[1] An occupational therapy evaluation in March 2005 noted C.L.'s "delays in fine motor development and visual motor coordination, which [were] impacting [ ] his ability to perform classroom tasks, such as writing and using scissors."

In March 2005, the District convened a committee pursuant to Section 504 of the Rehabilitation Act (the "504 Committee") to consider whether C.L. was disabled within the meaning of the statute and, if so, to recommend a

---

[1]     The LRC at Greenacres provides small-group academic support services to students with significant delays in their academic development.

course of action. The 504 Committee determined that C.L. was eligible for services under the Rehabilitation Act and thus prepared a Section 504 Accommodation Plan (the "504 Plan"). The 504 Plan recommended that C.L. be removed from class for thirty minutes once weekly for occupational therapy sessions in a 1:1 student-to-teacher ratio setting.

The 504 Committee reconvened in October 2005 and October 2006 to plan for the 2005-06 and 2006-07 school years, respectively. Noting C.L.'s difficulties with writing, remembering routines, and sustaining attention, the 2005-06 504 Plan recommended: the continuation of the once weekly speech-language therapy sessions in a 5:1 setting; an increase of the LRC sessions to four times a week in a 6:1 setting; and an increase of the occupational therapy sessions to twice weekly in one 1:1 setting and one 4:1 setting. The 2006-07 504 Plan observed that "[C.L.'s] reading ha[d] improved," but his "level of disfluency ha[d] increased . . . [to] stuttering" and he had begun to exhibit anxiety in the classroom. The 2006-07 504 Plan called for C.L. to continue largely the same services as the previous school year, except that the twice weekly occupational therapy sessions were now both in 1:1 settings.

In April 2007, a private occupational therapy evaluation arranged by C.L.'s parents placed C.L. in the twelfth percentile in visual-motor integration, second percentile in visual perception, first percentile in motor coordination, and sixth percentile in total motor composite. In May 2007, C.L.'s parents arranged for private occupational therapy sessions for him and consequently informed the District that he would no longer be receiving occupational therapy at Greenacres.

C.L.'s parents also arranged for the Soifer Center to conduct an independent psychoeducational evaluation of C.L., which took place over the course of six days in April and May 2007. The Soifer Center's evaluation placed C.L.'s "intellectual functioning within the upper end of the Low Average range." The evaluation found, however, that C.L.'s language and executive functioning abilities were weak, and that his reading and mathematical skills were also limited. Alarmed by this evaluation, C.L.'s parents requested that the 504 Committee reconvene.

On June 6, 2007, two days after the parents' conference with the Soifer Center about their child, the 504 Committee amended C.L.'s 504 Plan. The amended 504 Plan noted that "[a]lthough [C.L.] has made overall progress this year both in class and in the LRC, his teacher corroborates the findings of the

[Soifer Center] evaluation." The 504 Plan acknowledged that C.L. fidgeted and often required refocusing and reteaching of new concepts when he was in a large classroom setting, but noted that he had less trouble remaining on task in the smaller learning environment of the LRC. The 504 Plan was amended to add "15 hours of classroom aide time [per week] . . . to assist [C.L.] with his organization and execution of writing tasks," as well as various program and testing modifications.

After the end of the 2006-07 school year, C.L.'s parents sought a "second opinion" on the results of the Soifer Center evaluation and arranged for a neurodevelopmental evaluation of C.L. by Dr. Marilyn C. Agin. After examining C.L. in June 2007, Dr. Agin found that he had an early history of dyspraxia, which caused him to suffer from "weaknesses in attention, organization and sequencing; handwriting difficulties; and language processing difficulties." She also expressed concern about C.L.'s emotional well-being and self-esteem. Although Dr. Agin largely concurred with the recommendations of the 504 Plan created at Greenacres, she nonetheless "strongly urged that [C.L.'s] parents investigate a private educational setting with an expertise in teaching children with attentional and learning issues."

-11-

**2.** *The Fourth Year at Greenacres*

In October 2007, at the beginning of C.L.'s fourth year at Greenacres, the 504 Committee met and made no changes to the amended 504 Plan for 2007-08. In November 2007, a month after the 504 Committee created the 2007-08 504 Plan, C.L.'s parents requested a review by the District's Committee on Special Education ("CSE") to determine whether C.L. was entitled under the IDEA to special education services, including the development of an IEP.[2] The parents provided the CSE with the private evaluations of C.L., and the CSE conducted its own classroom observation, speech-language evaluation, and standardized testing of C.L., along with a developmental history interview of the parents.

The speech-language evaluation indicated that C.L. was consistently performing "in the average to significantly above average range." On the Stanford Diagnostic Reading Test, C.L. scored in the 82nd, 92nd, and 43rd percentiles in phonetic analysis, vocabulary, and comprehension respectively. On the first administration of the Stanford Diagnostic Mathematics Test, C.L. scored in the 9th and 3rd percentiles in concepts and applications and in

---

[2] New York assigns responsibility for fulfilling the state's obligations under the IDEA to local Committees on Special Education. N.Y. Educ. Law § 4402(1)(b)(1)(a) (McKinney 1999); *see also Walczak*, 142 F.3d at 123.

computations respectively, but the test administrator believed those scores did not reflect C.L.'s abilities because he was not concentrating. The second administration a few days later placed C.L. in the 38th and 84th percentiles in concepts and applications and in computations respectively.

After reviewing the private and District evaluations of C.L., the CSE concluded on January 8, 2008, that C.L. was not disabled under the IDEA and that he therefore was not eligible for special education services or an IEP. The CSE determined, however, that C.L. remained eligible for services and accommodations under Section 504 of the Rehabilitation Act. The CSE added that, "[s]ince [C.L.'s] reading skills have improved, committee members would like to reduce his time in the LRC to two periods per week, to address his writing skills." In reaching these conclusions, the CSE acknowledged, as the parents contended, that C.L. had "become increasingly resistant to attending the LRC . . . [and] fe[lt] stigmatized by having to leave the classroom to attend the LRC for four periods per week."

In May 2008, the 504 Committee convened to begin planning for C.L.'s fourth grade year. The 2008-09 504 Plan continued the services C.L. was already receiving. As suggested by the CSE, however, C.L.'s LRC sessions were

-13-

reduced from four to two times a week. Dissatisfied with the progress he was making, C.L.'s parents informed the District on June 19, 2008, that they were withdrawing C.L. from Greenacres and enrolling him at the Eagle Hill School.

### 3. *The 2008-09 School Year at Eagle Hill*

The Eagle Hill School is a private school for children with disabilities. The school educates children with language-based learning disabilities, approximately half of whom also have attention disorders. In determining whether to admit C.L., Eagle Hill reviewed his educational records, interviewed his parents, and observed him in a two-day visit during which he was paired with a current student. Eagle Hill teachers evaluated C.L. to determine his cognitive potential, learning style, and academic strengths and needs, and considered whether he would benefit from the Eagle Hill program.

C.L. was admitted and assigned an advisor who met with him daily to "coordinate[] and oversee[] [his] academic program," and to help him with "goal setting, communication among the staff, communication between teaching staff and specialists, [and] communication between school and home."

Eagle Hill employs a "diagnostic teaching model where teachers are constantly, on a daily basis, assessing a child's progressed goal and making

adjustments based on that assessment, tailoring accommodations to the child's learning style." Class sizes at Eagle Hill are tailored to the strengths and weaknesses of the individual students, and children with similar learning styles are assigned to the same classes. C.L. was placed in a 3:1 ratio language arts tutorial class for two periods daily to assist with his reading, comprehension, writing, and study skills. For math, history, writing, literature, and modeling, C.L. was placed in classes ranging from five to nine students in each class.

C.L.'s progress reports at Eagle Hill, issued in December 2008 and June 2009, show that he made progress in all subject areas. C.L. also became more active and enthusiastic over the school year, and was better able to express his ideas and work independently.

## C. Proceedings Below

### 1. Administrative Proceedings

On June 5, 2009, C.L.'s parents requested a due process hearing before an IHO to seek reimbursement of the tuition that they paid to Eagle Hill. The IHO concluded that at least by the third grade, if not before, C.L. was receiving such "a substantial array of test modifications, classroom accommodations, special education services and related services" that the District

was obligated to evaluate him under the IDEA. The IHO further determined that the District should have classified C.L. as disabled under the IDEA, which would have entitled him to special education services and the creation of an IEP. The IHO ruled that, by failing to provide an IEP for C.L., the District denied him a FAPE. The IHO also concluded that the 504 Plan proposed by the District for the 2008-09 school year was not an appropriate substitute for an IEP because, among other things, the 504 Plan recommended a general education class that was too large. The IHO also held that the parents' private placement was appropriate under the IDEA, highlighting the various services Eagle Hill offered C.L. and noting the "significant progress" C.L. made during the 2008-09 school year. The IHO then weighed the equities and found no reason to deny tuition reimbursement.

On appeal, the SRO found error in the IHO's decision. Although the SRO agreed that C.L. was indeed denied a FAPE, he concluded that the parents failed to meet their burden of demonstrating that the private placement they chose for C.L. was appropriate under the IDEA. In the SRO's view, there was evidence in the record that C.L. "made progress" at Greenacres, and consequently "[C.L.] did not require a special education environment such as Eagle Hill, which

-16-

provided no opportunity for the student to interact with nondisabled peers."

The SRO then concluded: "When considering the restrictiveness of the parental

placement, under the facts of the instant case, I conclude that the parents are not

entitled to an award of tuition reimbursement based on the restrictiveness of

Eagle Hill." The SRO did not discuss any of the specific services provided at

Eagle Hill other than to observe that C.L. was not receiving occupational therapy

at Eagle Hill.

### 2. *The District Court*

C.L.'s parents filed suit in the district court seeking to have the SRO's

decision reversed. They also added a claim under Section 504 of the

Rehabilitation Act, arguing that the District had discriminated against C.L. on

account of his disabilities. The district court determined that the SRO's decision

was entitled to deference because there was evidence supporting the SRO's

conclusions that C.L. made progress at Greenacres and that he benefited from

interactions with his peers. *C.L. v. Scarsdale Union Free Sch. Dist.*, 913 F. Supp. 2d

26, 36-39 (S.D.N.Y. 2012). The district court also found no evidence of bad faith

or deliberate indifference, as required to establish a Rehabilitation Act claim. *Id.*

at 40-41. Consequently, the district court granted the District's cross-motion for summary judgment as to both claims.

This appeal followed.

## DISCUSSION

We address the IDEA and Rehabilitation Act claims in turn.

### A. The IDEA Claim

#### 1. Applicable Law

##### a. Standard for Tuition Reimbursement under the IDEA

Where a school district denies a disabled child a FAPE, the parents may place the child in an appropriate private school and then seek tuition reimbursement from the school district. *See Burlington*, 471 U.S. at 370; *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12-13 (1993). The parents bear the burden of showing that the private placement they selected was appropriate for the child and that the equities weigh in their favor. *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 184-85 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2802 (2013); *M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of Yonkers*, 231 F.3d 96, 104 (2d Cir. 2000) , *abrogated in part on other grounds, Schaffer v. Weast,* 546 U.S. 49 (2005).

The parents' placement of the child must be "'reasonably calculated to enable the child to receive educational benefits,'" *Frank G.*, 459 F.3d at 364 (quoting *Rowley*, 458 U.S. at 207), such that the placement is "likely to produce progress, not regression," *id.* (quoting *Walczak*, 142 F.3d at 133).  Progress may be demonstrated by grades, test scores, regular advancement, or other objective evidence, but no single factor is dispositive as "courts assessing the propriety of a unilateral placement [must] consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs." *Id.*  An inquiry into the appropriateness of a private placement is thus a search for indicators that "the placement provides 'educational instruction specially designed to meet the unique needs of a [disabled] child, supported by such services as are necessary to permit the child to benefit from instruction.'" *Id.* at 365 (quoting *Rowley*, 458 U.S. at 188-89).

This case presents the issues of whether and, if so, to what extent a parents' private placement must take into account the IDEA's "strong preference for 'mainstreaming,' or educating children with disabilities '[t]o the maximum extent appropriate' alongside their non-disabled peers." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (quoting 20 U.S.C. § 1412(a)(5)).

With respect to the first issue, we have held that restrictiveness is a factor in the parents' choice of private placement, for it remains the case that the IDEA maintains a "strong preference" for educating disabled children in the least restrictive environment. *Walczak*, 142 F.3d at 122. We have recognized that the "IDEA's requirement that an appropriate education be in the mainstream to the extent possible . . . remains a consideration that bears upon a parent's choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate." *M.S.*, 231 F.3d at 105 (citing 20 U.S.C. § 1412(5)(B)).[3] We held in *M.S.* that the SRO's conclusion that the private placement was inappropriate was supportable, and thus we reversed the district court's conclusion otherwise. *Id.*

With respect to the second issue, the extent to which the restrictiveness of a private placement is a consideration in the appropriateness inquiry, we note the following:

---

[3] Other circuits have taken a perhaps broader approach. *See, e.g., Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss ex rel. Boss*, 144 F.3d 391, 400 (6th Cir. 1998) ("we hold that the failure of the [school] to satisfy the IDEA's mainstreaming requirement does not bar the [parents] from receiving reimbursement"); *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 83-84 (3d Cir. 1999); *C.B. ex rel. B.B. v. Special Sch. Dist. No. 1, Minneapolis, Minn.*, 636 F.3d 981, 991 (8th Cir. 2011).

First, parents "are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education." *Frank G.*, 459 F.3d at 364 (citing 20 U.S.C. § 1401(9)); *see also Carter*, 510 U.S. at 12-14 (observing that a number of IDEA provisions -- including those requiring education of disabled children under public supervision and the creation of IEPs designed by local educational agencies -- "do not make sense in the context of a parental placement").

Second, along the same lines, "parents . . . may not be subject to the same mainstreaming [or LRE] requirements as a school board." *M.S.*, 231 F.3d at 105 (citing *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999)); *see also Frank G.*, 459 F.3d at 364. As the Fourth Circuit has pointed out, the IDEA's LRE requirement "was aimed at preventing *schools* from segregating [disabled] students from the general student body," but not necessarily "to restrict *parental* options when the public schools fail to comply with the requirements of the [IDEA]." *Carter ex rel, Carter v. Florence Cnty. Sch. Dist. Four*, 950 F.2d 156, 160 (4th Cir. 1991) (citing H.R. Rep. No. 94-332 (1975)), *aff'd*, 510 U.S. 7 (1993).

Third, parents whose children are denied a FAPE may be and often are forced to turn to specialized private schools that educate only disabled children. Such private schools are necessarily restrictive as they do not educate disabled and nondisabled children together, and may be more restrictive than the public school from which the child was removed. Inflexibly requiring that the parents secure a private school that is nonrestrictive, or at least as nonrestrictive as the FAPE-denying public school, would undermine the right of unilateral withdrawal the Supreme Court recognized in *Burlington*. *See* 471 U.S. at 370; *see also Boss*, 144 F.3d at 400 (noting Congress did not intend for a parent to choose between, on the one hand, letting child remain in FAPE-denying public school, and, on the other hand, removing child to specialized private school without tuition reimbursement merely because specialized private school is more restrictive than FAPE-denying public school).

Finally, "the test for the parents' private placement is that it is appropriate, and not that it is perfect." *Warren G.*, 190 F.3d at 84.

Hence, while the restrictiveness of a private placement is a factor, by no means is it dispositive. *See Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 488 (4th Cir. 2011) ("[W]hile a parental placement is not

-22-

inappropriate simply because it does not meet the least-restrictive-environment requirement, it is nonetheless proper for a court to consider the restrictiveness of the private placement *as a factor* when determining the appropriateness of the placement." (emphasis in original)).  Restrictiveness may be relevant in choosing between two or more otherwise appropriate private placement alternatives, or in considering whether a private placement would be more restrictive than necessary to meet the child's needs, but where the public school system denied the child a FAPE, the restrictiveness of the private placement cannot be measured against the restrictiveness of the public school option.

### b.    Standards of Review

We review *de novo* a district court's decision to grant summary judgment on an IDEA claim.  *R.E.*, 694 F.3d at 184.

In considering an IDEA claim, a district court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (quotation marks omitted); *see also* 20 U.S.C. § 1415(i)(2)(C)(iii); *R.E.*, 694 F.3d at 184.  The obligation to independently review the record, however, "is by no means an invitation to the courts to substitute

their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Federal courts "lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* at 208 (quotation marks omitted). Consequently, district courts must accord deference to state administrative agencies when reviewing their IDEA decisions. *See Gagliardo*, 489 F.3d at 112-13; *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005) ("In reviewing the administrative proceedings, it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy."). The deference owed, however, is not absolute as it "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012).

Finally, as a general matter, "[w]hen an IHO and SRO reach conflicting conclusions, we defer to the final decision of the state authorities, that is, the SRO's decision." *R.E.*, 694 F.3d at 189 (internal quotations marks and

alterations omitted).  Where the SRO's decision, however, is "insufficiently reasoned to merit that deference" and the IHO's decision is "more thorough and carefully considered," the reviewing court may consider and defer to the IHO's decision.  *Id.* at 189 (alteration omitted) (quoting *M.H.*, 685 F.3d at 246); *accord C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, No. 11-5003-cv,  2014 WL 814884, at *5 (2d Cir. Mar. 4, 2014).

### 2.  *Application*

Both the IHO and SRO found that C.L. was denied a FAPE because he should have been classified as a student with a disability who was eligible for special education services under the IDEA.  The District does not challenge these findings.  Hence, the questions presented are (a) whether C.L.'s placement at Eagle Hill was appropriate, and, if so, (b) whether the equities weigh in favor of C.L. and his parents.  We address both questions in turn.

### a.  *The Appropriateness of the Placement at Eagle Hill*

We conclude that the SRO's decision that the placement at Eagle Hill was not appropriate is not entitled to the deference ordinarily accorded to state administrative IDEA decisions.  The SRO's decision was not sufficiently reasoned or carefully considered because the SRO did not consider or comment on *any* of

the specific services provided to C.L. at Eagle Hill or the progress that the record shows he made at the school. Instead, we defer to the IHO's decision, which was more thorough and carefully considered. The IHO discussed in detail Eagle Hill's services and C.L.'s progress there.

The SRO did not discuss the particulars of the Eagle Hill program or whether its services were appropriate for C.L.'s needs, other than to note that Eagle Hill did not provide occupational therapy services. C.L. was receiving those services privately anyway, and his parents were not required in any event to prove that the "private placement furnishes every special service necessary." *Frank G.*, 459 F.3d at 365.

In contrast, the IHO examined the specifics of the education C.L. received at Eagle Hill. The IHO initially noted Dr. Agin's private neurodevelopmental evaluation of C.L., which recommended that he be placed in a private school that specializes in educating learning-disabled children. The IHO then considered Eagle Hill's curriculum, describing it as "researched based and individualized for each student," explaining that "[a] diagnostic model is used in which a student's progress is assessed on a daily basis and adjustments made as needed." The IHO also discussed how, before Eagle Hill admitted C.L.,

"his educational records were reviewed, parents were interviewed and a two day visit to the school by the student took place," after which the teachers who instructed C.L. participated with an admissions team in determining C.L.'s appropriateness for Eagle Hill. The IHO found "that such a process is likely to result in an appropriate placement."

The IHO also delved into the specifics of C.L.'s classes, recounting how "C.L. received a tutorial class two periods per day with three students instructed by a special education teacher specifically aimed at remediating the student's weaknesses in written expression and study skills, areas of significant need for C.L." That tutorial class, the IHO found "was a particularly appropriate program for C.L." The IHO also discussed C.L.'s small class sizes at Eagle Hill: five to eight students for math and history, nine for literature, and seven for writing. For that writing class, the IHO explained that "modeling and other special strategies were used for instruction" because it was an "area of substantial deficit for C.L."

Moreover, the IHO related how "[i]n addition to small class instruction using individualized teaching strategies and a daily tutorial period in areas of significant difficulty, Eagle Hill provided C.L. with an advisor who met

with the student daily, observed him in class, and participated in weekly staff meetings regarding the student." None of this was so much as mentioned by the SRO. The SRO could not diligently consider whether Eagle Hill was appropriate without assessing what the school had to offer.

The SRO likewise did not examine C.L.'s progress at Eagle Hill, as reflected in progress reports, standardized test results, and year-end letters to his parents. The IHO, by comparison, found that "C.L. plainly made significant progress at Eagle Hill during the 2008/09 school year." Citing C.L.'s progress reports and the testimony of Eagle Hill's Director of Admissions, the IHO explained: "He became enthusiastic about attending school, more confident as a learner, [and] better able to express himself and work independently." The IHO also noted that C.L.'s parent believed Eagle Hill had made C.L. "more independent and confident with less anxiety and better able to make friends." Again, none of this was mentioned by the SRO.

By not taking into consideration Eagle Hill's services or C.L.'s progress, the SRO improperly gave dispositive weight to the restrictiveness of Eagle Hill in reaching the conclusion that it was inappropriate for C.L. The SRO determined that, because C.L. was making progress in Greenacres's

nonrestrictive general education classrooms with supports and services, Eagle

Hill's restrictive program was not the least restrictive environment in which C.L.

could obtain an appropriate education.[4]  In effect, the SRO ruled Eagle Hill

inappropriate merely because it was more restrictive than Greenacres.  This was

error, for the reasons we discussed above.  C.L.'s parents were not precluded

from selecting Eagle Hill merely because it was more restrictive than Greenacres.

In contrast to the SRO, the IHO considered the restrictiveness of Eagle Hill

without giving it dispositive weight, concluding that "C.L.'s need for a small

class, special education program with specific programs and strategies to address

C.L.'s significant needs far outweighs [the] benefit from interaction with non-

disabled peers."

---

[4]     To be sure, there was substantial evidence in the record to support the SRO's conclusion that C.L. made progress at Greenacres, including favorable test results and report cards.  But overall, the results were decidedly mixed, and C.L. continued to have difficulties while at Greenacres.  The private evaluations, for example, showed significant academic and learning deficiencies.  Moreover, the progress that C.L. made at Greenacres was undoubtedly the result of the "increasing amounts of special education services, programs, and accommodations" that he was receiving, including "an aide for most of the day" and "substantial 1:1 assistance from the regular education teacher."

On these bases, the IHO ruled that "Eagle Hill is an appropriate, if not an ideal placement for C.L." We are persuaded by the IHO's reasoning, and we thus defer to the IHO's conclusion that Eagle Hill was appropriate for C.L.

### b. The Equities

We also defer to the IHO's ruling with respect to the weighing of the equities, an issue that the SRO did not reach after finding the placement at Eagle Hill inappropriate. Important to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA. *See Warren G.*, 190 F.3d at 85-86. As the IHO noted, the parents cooperated with the District in its efforts to meet its obligations under the IDEA. *See id.* Hence, their pursuit of a private placement was not a basis for denying their tuition reimbursement, even assuming, as the District contended before the IHO, that the parents never intended to keep C.L. in public school for the 2008-09 school year. The fact is that the parents also requested that the District evaluate C.L. under the IDEA and develop an IEP for him. When the District determined -- incorrectly -- that C.L. was not entitled to special services under the IDEA, it was appropriate for the parents to turn to a private placement.

The question remains whether to reverse or remand for further development of the record. Here, where the SRO's analysis was not sufficiently reasoned but the IHO's detailed findings and conclusions were thorough and carefully considered, we defer to the IHO and reverse for the reimbursement of tuition as awarded by the IHO.

**B.    *The Rehabilitation Act Claim***

We turn to C.L.'s Rehabilitation Act claim. Section 504 provides:

> No otherwise qualified individual with a
> disability in the United States, . . . shall, solely by
> reason of her or his disability, be excluded from
> the participation in, be denied the benefits of, or
> be subjected to discrimination under any
> program or activity receiving Federal financial
> assistance.

29 U.S.C. § 794 (a). A prima facie violation of Section 504 requires proof from the plaintiff that "(1) he is a '[disabled] person' under the Rehabilitation Act; (2) he is 'otherwise qualified' for the program; (3) he is excluded from benefits solely because of his [disability]; and (4) the program or special service receives federal funding." *Mrs. C. v. Wheaton*, 916 F.2d 69, 74 (2d Cir. 1990). Courts in this Circuit have recognized that a Section 504 claim may be predicated on the claim that a disabled student was "denied access to a free appropriate education, as

compared to the free appropriate education non-disabled students receive." *S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282, 290 (S.D.N.Y. 2007); *see also BD v. DeBuono*, 130 F. Supp. 2d 401, 439 (S.D.N.Y. 2000).  Such a claim, however, requires proof of bad faith or gross misjudgment.  *See Wenger v. Canastota Cent. Sch. Dist.*, 979 F. Supp. 147, 152 (N.D.N.Y. 1997) ("[S]omething more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities, i.e., a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment."), *aff'd mem.*, 208 F.3d 204 (2d Cir. 2000).

Here, as the district court held, the parents failed to present sufficient evidence of bad faith or gross misjudgment to raise an issue for trial. They claim that the District "deliberately" limited the accommodations provided to C.L. to avoid triggering policies that would have required the development of an IEP.  They fail, however, to point to any concrete evidence to support the assertion.  On this record, no reasonable factfinder could find bad faith or gross misjudgment.  The fact that the District was wrong in concluding that C.L. was not entitled to an IEP does not, without more, mean that it acted in violation of

the Rehabilitation Act. *See S.W. by J.W.*, 528 F. Supp. 2d at 289; *Wenger v. Canastota Ctrl. Sch. Dist.*, 979 F. Supp. at 152.

## *CONCLUSION*

We conclude that the district court erred in dismissing the parents' IDEA claim for private tuition reimbursement, but that it correctly dismissed their Rehabilitation Act claim. Accordingly, the judgment of the district court is **REVERSED** in part and **AFFIRMED** in part, and we **REMAND** the case to the district court with instructions to enter judgment in favor of plaintiffs-appellants on their IDEA claim.