I.M. v City of New York (2019 NY Slip Op 07756)





I.M. v City of New York


2019 NY Slip Op 07756


Decided on October 29, 2019


Appellate Division, First Department


Moulton, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on October 29, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick, J.P.
Peter Tom
Anil C. Singh
Peter H. Moulton, JJ.


17741/07 8453 

[*1]I.M., by Parent and Natural Guardian L.M., Plaintiff-Appellant,
v
City of New York, et al., Defendants-Respondents, John Doe, etc., et al., Defendants.



Plaintiff appeals from an order of the Supreme Court, Bronx County (Alison Y. Tuitt, J.), entered on or about March 7, 2017, which, insofar as appealed from, granted defendants' motions for summary judgment dismissing plaintiff's statutory claims against them.




Clement H. Berbe, New York, and the Law Offices of Mitchell I. Weingarden, White Plains (Mitchell I. Weingarden of counsel), for appellant.
Zachary W. Carter, Corporation Counsel, New York (Elina Druker and Fay Ng of counsel), for City respondents.
Ahmuty, Demers & McManus, Albertson (Glenn A. Kaminska and Nicholas M. Cardascia of counsel), for The Pioneer Transportation Corporation, respondent.



MOULTON, J.


This action arises from defendants' alleged failure to provide plaintiff I.M. with an appropriate mode of transportation to his special education school. According to plaintiff, this deprivation caused him to act out, exposed him to harm and impaired his access to the free [*2]appropriate public education (FAPE) to which he had a statutory right.[FN1]
In 2005, I.M. was a six-year-old nonverbal diapered child with autism spectrum disorder, moderate to severe intellectual disability, and attention deficit disorder. His 2005-06 Individualized Educational Program (IEP) stated, in bold faced type, that he required a "mini-bus" to transport him to and from school [FN2]. However, due to a computer coding error he was placed on a full-sized school bus operated by defendant the Pioneer Transportation Corporation (Pioneer) from September 8, 2005 through October 19, 2005. During this period, Pioneer filed nine incident reports with I.M.'s school in connection with these trips. I.M.'s family also repeatedly complained to I.M.'s school and to the New York City Department of Education's Office of Pupil Transportation (OPT). The problem was not rectified until October 20, 2005, when I.M. was placed on a minibus in accordance with his IEP.
Plaintiff I.M., by his father, appeals from Supreme Court's dismissal of his claims under section 504(a) of the Rehabilitation Act of 1973 as amended (the RA), Title II of the Americans with Disabilities Act of 1990 (the ADA), section 296(2)(a) of the New York State Executive Law, and section 8-107 of the Administrative Code of the City of New York (the State and City HRLs). Supreme Court dismissed these statutory claims on the basis that "[t]here is no evidence that the infant was purposefully discriminated against as a result of his disability when he was placed on the full-sized bus."[FN3] It let stand plaintiff's common-law negligence and gross negligence claims. The only issue on appeal is whether Supreme Court properly dismissed plaintiff's statutory discrimination claims.
We now reverse in part and reinstate these statutory discrimination claims against the Board of Education of the City of New York, its employees Lorraine Sesti and Joanne Richburg, [*3]and OPT (collectively DOE)[FN4]. We affirm Supreme Court's dismissal of the statutory claims against Pioneer but on different grounds. Viewing the evidence, much of which is uncontested, in the light most favorable to I.M. as nonmovant, issues of fact exist as to whether DOE violated the discrimination statutes by acting with bad faith, gross misjudgment, or deliberate indifference to I.M.'s rights to be transported by minibus, thereby depriving him of a FAPE. A reasonable jury could conclude that a simple bureaucratic mistake was compounded by inaction into a violation of the RA, the ADA and the State and City HRLs.
Relevant Facts
A. The IEP
I.M.'s 2005-06 IEP was created by a team of DOE professionals, with input from I.M.'s family. The IEP was signed by I.M.'s grandmother, defendant Richburg (as District Representative for the Committee on Special Education), a counselor, a speech pathologist, an occupational therapist, and a school nurse. The IEP indicates that I.M. had "significant academic, behavioral and language/communication needs"; that I.M. required "intensive supports"; and that I.M. needed "highly intensive supervision" in a "highly structured learning environment." The IEP also indicates that I.M. "has difficulty remaining in his seat." In addition, I.M.'s 2006-07 IEP indicates that "[w]hen he is frustrated or upset he begins to jump up and down, but is able to calm self." Thus, DOE's team of professionals determined that, to provide I.M. with a FAPE, his challenges necessitated that he be placed in a class with five other students, one teacher, and one paraprofessional. They also determined that given I.M.'s challenges, he required minibus transportation as a "related service" in order to benefit from his special education [FN5]. Defendant Richburg acknowledged at her deposition that the purpose of an IEP is to assure that each student receives the best possible education considering the student's disability and that each IEP contains a section that specifies the requisite type of transportation.
B. I.M.'s Commute To And From School
At her deposition, I.M.'s teacher Yvonne Elaine Dixon agreed that I.M. required a minibus because, among other things, it carried fewer children, had a shorter ride, and was "calmer, not as much activity." She testified that a shorter ride would help prevent I.M. from becoming agitated and "start up and down jumping or crying or whatever have you . . . when you have a bigger bus it's just a little harder." The record indicates that a minibus typically carried 8 to 12 children. By contrast, a full-sized bus held 34 to 45 children.
Despite the direction in I.M.'s IEP that he travel in a minibus for his school commute he was placed on a full-sized school bus owned and operated by defendant Pioneer, a private carrier that contracted with DOE. Within days I.M. began acting out on his commute. Pioneer personnel wrote up nine "Student Misbehavior Reports" for I.M. on bus trips from September 20, [*4]2005 through October 19, 2005. Bus matron Patricia Del Ponte, who filled out six of the nine reports in September, testified that she handed her reports to Richburg because she was the bus coordinator who met the buses at school in the morning and afternoons. At her deposition, Richburg confirmed that as the coordinator for the school's transportation it was her practice to initial the reports that the matrons handed to her. All of the reports bear the initials "J.R." except the September 23, 2005 report which bears the initials "C.S."[FN6] The September reports provide:
September 20, 2005 - "In P.M. he was disruptive on bus. He was throwing his stuff around. Also he took off his shirts. He also banged his fist on bus window."
September 21, 2005 - "In P.M. he took off his socks and sneakers & threw them on the bus floor. I was not aware of this because the bus is full with many students, some of which [sic] are very disruptive. He needs a para because it is impossible for me to just watch him. He also eats food on bus."
September 22, 2005 - "In PM he took off his shoes and socks & threw them on floor of bus. He also threw his book bag. He refuses to put his socks and shoes on again."
September 23, 2005 - "In P.M. he took off his socks & shoes and threw them on bus floor along with his book bag. He was also yelling and banging on bus window. This happens every day."
September 29, 2005 - "In PM he was standing in his seat. He was also banging on the window. He took off his socks & sneakers" (emphasis added). Notably, the matron checked off a box that states "CHILD REFUSES TO WEAR SEATBELT."
September 30, 2005 - "Took his sock & sneakers off on bus & threw them. He also threw his school bag & was banging on window."
According to I.M.'s father, I.M.'s bus route - - but not the size of the bus - - changed in October. He explained that more students were on the bus and many of them were older middle school children (about 14 years old). Pioneer bus matron Joanne Indiviglia testified at her deposition that the older children were about 10 to 12 years old. Indiviglia testified that she witnessed Richburg initial the three October reports that the bus matron prepared. The October reports provide:
October 18, 2005 - "[I.M.] pulled down his pants to his knees and began playing with his genitals in view of the other children."[FN7]
October 18, 2005 - "[I.M.] took his pants off and began jumping on the seat, he then [*5]removed his diaper & began playing with his genitals."
October 19, 2005 - "[I.M.] pulled down his pants to his ankles — 10/19/05&commat; 8:20 A.M."
At her deposition, Indiviglia testified that on the October 17, 2005 afternoon bus trip I.M. had "opened his pants up and ripped into the side of his diaper." She explained that once the children saw that I.M. "was playing with his genitals" they took off their seatbelts. Indiviglia testified that I.M. did not comply with her attempts to put his clothes on, and that the ride devolved into chaos as she attempted to deal with I.M.'s needs and the needs of the other special education students. Indiviglia explained that she told the school bus coordinator what happened when she handed her the report on the morning of October 18, 2005.
The afternoon bus ride on October 18, 2005 was, according to Indiviglia, "a little worse." She testified that I.M. was "doing the same thing again." He took his pants off, masturbated and jumped on his seat. She testified that he walked down the aisle with his pants down and his genitals exposed. Indiviglia also testified that he "really tore into the diaper and started throwing the stuffing from the diaper around." She described that within 15 minutes, "there was stuffing everywhere." On the morning of October 19, 2005, Indiviglia testified that I.M. arrived at school with his pants down to his ankles and the school bus coordinator witnessed this. That day I.M.'s father informed Richburg that in the future he would drive I.M. to and from school, and he drove I.M. home that afternoon.
I.M. was placed on a minibus the following day. After that, I.M. apparently had no further incidents during his school commute.
I.M.'s family repeatedly complained about defendants' failure to adequately monitor and care for him while he was on the bus. In his affidavit in opposition to summary judgment, I.M.'s father explained that he complained to Pioneer after I.M. came home missing a shoe in September 2005 and bus matron Del Ponte informed him that I.M. threw his shoe out of the window. He asserted that he informed Pioneer that he was concerned that I.M. was not being supervised or cared for properly. He also explained that he called Jeff Berger at OPT at this time with the same complaint and he requested that his child be placed on a different bus. According to I.M.'s father, Berger responded that he would look into the matter.
In addition, I.M.'s father stated that he called Pioneer on October 17, 2005 after bus matron Indiviglia described to him what happened on the bus that day. The record also includes a October 19, 2005 OPT Report that indicates that I.M.'s grandmother called to complain that I.M. arrived at school naked and, because he could not remove his own clothes, she expressed concern that another child may have abused him. In all, the record contains four OPT complaint numbers. It also contains an October 19, 2005 note from the father's fiancée (later his wife) to I.M.'s teacher stating:
"Yesterday when [I.M.'s] bus pulled up, he was nude on the back of the bus. I was advised he was moved to the back of the bus because he was playing with himself. Can you please make sure his belt is tight. We don't think this will help. But I am going to visit his doctor today, to try to see what can be done to prevent him from doing that. If you could also send me the number of the bus company, my mother-in-law is going to get him put on to a little bus."[FN8]
Richburg admitted at her deposition that she knew that "there was an incident where [I.M.] was taking off his shirt and throwing his shoes out the window" and, that on at least two occasions "he was taking off his socks and shoes on the bus."[FN9] Discussion
The ADA provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" (42 USC § 12132). The RA provides in relevant part that no qualified person with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" (29 USC § 794[a]).
A brief discussion of the IDEA and its relationship to the ADA and RA is warranted here. The IDEA requires that disabled students receive a FAPE that is tailored to each student's individual needs (see Scaggs v New York State Dept. of Educ., 2007 WL 1456221, *3, 2007 US Dist LEXIS 35860, *10 [ED NY, May 16, 2007, No. 06-CV-0799 (JFB)]). That goal is accomplished primarily through the design and implementation of an IEP (id.). The RA similarly requires that a disabled student receive a FAPE that is properly tailored to the student's needs (see C.L. v Scarsdale Union Free Sch. Dist., 744 F3d 826, 840-841 [2d Cir 2014]). The "IDEA is phrased in terms of a state's affirmative duty to provide a free, appropriate public education [and the RA] is worded as a negative prohibition against disability discrimination in federally funded programs" (W.B. v Matula, 67 F3d 484, 492 [3d Cir 1995], abrogated on other grounds by A.W. v Jersey City Public Schools, 486 F3d 791 [3d Cir 2009]). Thus, the RA offers relief from discrimination "whereas IDEA offers relief from inappropriate educational placement, regardless of discrimination" (Gabel ex rel L.G. v Board of Educ. of Hyde Park Cent. Sch. Dist., 368 F Supp 2d 313, 333 [SD NY 2005]). The "denial of access to an appropriate educational program on the basis of a disability is [an RA] issue, whereas dissatisfaction with the content of an IEP would fall within the purview of IDEA" (id. at 333-334).
While there are no specific ADA regulations concerning the education of disabled children, the ADA has been interpreted co-extensively with the RA's special education requirements (see R.B. ex rel. L.B. v Board of Educ. of the City of New York, 99 F Supp 2d 411, 419 [SD NY 2000]).
Given that the three statutes are related, a plaintiff may assert an RA and ADA claim, in conjunction with an IDEA claim, on the theory that the disabled student has been denied access to a FAPE (see R.B., 99 F Supp 2d at 419; see also C.L., 744 F3d at 841)[FN10].
Standards for recovery under the ADA and the RA "are generally the same" (Henrietta D. v Bloomberg, 331 F3d 261, 272 [2d Cir 2003], cert denied 541 US 936 [2004]). To establish a prima facie violation under the ADA and the RA, a plaintiff must show that "(1) she is a qualified individual with a disability; (2) that the defendants are subject to one of the [statutes]; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability" (Harris v Mills, 572 F3d 66, 73-74 [2d Cir 2009])[FN11]. The RA and ADA require that reasonable accommodations may have to be provided to assure that a disabled student can participate in, or benefit from, defendants' services (id. at 73).
State HRL "disability discrimination claims are governed by the same legal standards as federal ADA claims" (Pimentel v Citibank, N.A., 29 AD3d 141, 147 n 2 [1st Dept 2006], lv denied 7 NY3d 707 [2006]; accord Rodal v Anesthesia Group of Onandaga, P.C., 369 F3d 113, 117 n 1 [2d Cir 2004])[FN12]. The City HRL is as or more protective than State and Federal discrimination laws (see Williams v New York City Hous. Auth., 61 AD3d 62, 65 [1st Dept 2009], lv denied 13 NY3d 702 [2009])[FN13].
Given the close overlap, if a plaintiff can satisfy his or her burden under the ADA, a plaintiff will also satisfy his or her burden under the RA and the State and City HRLs (see Williams v City of New York, 121 F Supp 3d 354, 364 n 10 [SD NY 2015]).
DOE, and our colleague, who dissents in part, argue that plaintiff has not shown the requisite level of intent, nor sufficient causation, to establish a prima facie claim under the statutes. We disagree.
Over 30 years ago in Alexander v Choate, the United States Supreme Court recognized that disability discrimination is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference — of benign neglect" (469 US 287, 295 [1985]). Thus, a disabled plaintiff "need not show defendants acted with animosity or ill will" to prove a violation of either the RA or ADA (R.B., 99 F Supp 2d at 419; see also Loeffler v Staten Is. Univ. Hosp., 582 F3d 268, 275 [2d Cir 2009]). It is well settled that a disabled student can plead a claim under the RA or ADA by showing that the defendant "acted in bad faith or with gross misjudgment when administering disability services" (J.L. v New York City Dept of Educ., 324 F Supp 3d 455, 467 [SD NY 2018] [the plaintiffs sufficiently pleaded that New York City Department of Education violated the RA and ADA by acting with gross misjudgment in failing to provide nursing and special transportation services in accordance with three disabled student's IEP's]; Rutherford v Florida Union Free Sch. Dist., 2019 WL 1437823, *36, 2019 US Dist LEXIS 55971, *105 [SD NY, March 29, 2019, No. 16-CV-9778 (KMK)] [the plaintiffs sufficiently pleaded that the Board of Cooperative Educational Services acted with bad faith or gross misjudgment by failing to implement the IEP it helped to create]; Gabel ex rel L.G., 368 F Supp 2d at 334-335 [issues of fact existed whether the Board of Education of the Hyde Park Central School District's errors in handling a disabled student's placement rose to the level of gross negligence or reckless indifference]; R.B., 99 F Supp 2d at 419 [the plaintiff sufficiently pleaded that the New York City Department of Education and other defendants acted with bad faith or gross misjudgment in denying the plaintiff a FAPE by failing to comply with the student's IEP's private school placement]). Courts have also equated gross misjudgment with deliberate or reckless indifference (see J.L., 324 F Supp 3d at 468)[FN14].
Contrary to Supreme Court's and our dissenting colleague's conclusion, plaintiff has demonstrated a prima facie violation of the ADA, the RA, and the State and City HRLs. While DOE half-heartedly argues that it "was sensitive" to I.M.'s educational needs, a reasonable jury could find that DOE acted with bad faith, gross misjudgment, or deliberate indifference to I.M.'s rights to be transported by minibus thereby depriving him of a FAPE. While the original coding error was arguably the product of simple bureaucratic negligence, a reasonable jury could conclude that DOE's inaction, in the face of the reports and family complaints, escalated into a violation of the RA, the ADA, and the State and City HRLs (see J.L., 324 F Supp 3d at 468 ["[w]hile bureaucratic incompetence may have triggered DOE's failure to implement IEP services, it eventually morphed into a reckless disregard for [the plaintiffs'] educational needs"]).[FN15]
Our dissenting colleague further concludes that even if plaintiff could establish DOE's intentionality, plaintiff did not establish that the requisite intention was "causally linked with" or "directed at" I.M.'s disability. Thus, our colleague concludes that plaintiff did not suffer "a deprivation of an educational service on account of plaintiff's autism."[FN16]
The "by reason of" language in the ADA, the "solely by reason of" language in the RA, and the "because of" language in the State and City HRLs set forth a causation requirement (see Henrietta D., 331 F3d at 277-278). In the context of a failure-to-accommodate claim related to public services, a plaintiff can demonstrate that his or her disability is "a cause of the denial of access to benefits" by demonstrating that the disability-related challenges make it more difficult for the plaintiff to access public services than for those without disabilities and that a reasonable accommodation should have been, but was not, provided (see Henrietta D., 331 F3d at 278-281).
The dissent expresses no theory of causation that is unrelated to I.M.'s disability. While our colleague points to evidence that I.M. engaged in similar behaviors at home, those behaviors are directly related to I.M.'s disability. Nor is there a speculative link between I.M.'s behavior and the bus size, as our colleague suggests. Far from being speculative, DOE determined that "because of" I.M.'s disability, he required the "related service" of a minibus to meaningfully access his FAPE and benefit from his special education.[FN17]
The dissent also incorrectly posits that I.M. cannot assert claims under the discrimination statutes because he was physically transported to and from school on the full sized-bus, and thus, he was not "excluded" from an educational service. This position overlooks that the RA and ADA not only prohibit the exclusion from an educational service, but also prohibit the denial of the opportunity to "benefit from" those services. A student does not need to demonstrate that he or she is physically prevented from school access to demonstrate that he or she is denied the opportunity to benefit from a defendant's services (see e.g. Davis v Monroe County Bd. of Educ. 526 US 629 [1999] [analyzing student sexual harassment under Title IX of the Education Amendments of 1972 which provides that no person shall be "excluded from participation in, be denied the benefits of, or be subjected to discrimination" because of sex]). Where a student's educational experience is undermined, equal access to the school's opportunities is effectively denied (see id. at 651). As we previously noted, DOE has already determined that given I.M.'s challenges, he required minibus transportation as a "related service" in order to meaningfully access his FAPE and benefit from his special education. Accordingly, Supreme Court erred in dismissing plaintiff's statutory discrimination claims against DOE.
Supreme Court correctly granted Pioneer's motion to dismiss I.M.'s claims under the under the RA, the ADA and the State and City HRLs, although not for the reasons stated. As a threshold matter, as a private bus company, and not a direct recipient of any federal funding, Pioneer is not amenable to direct suit by I.M. under the RA (see United States Dept. of Transp. v Paralyzed Veterans of Am., 477 US 597, 605 [1986]; Doe v Jamaica Hosp., 202 AD2d 386, 387 [2d Dept 1994]). In any event, plaintiff's statutory claims against Pioneer were correctly dismissed because they all arise from a failure to accommodate I.M. with minibus transportation, as provided for in his IEP. However, it is only DOE that has the obligation to provide plaintiff with a FAPE under 20 USC § 1412(a)(1)(A) and to provide him with minibus transportation to and from school as a accommodation in connection with that federal law. Pioneer cannot be held liable for the failure to accommodate I.M. emanating solely from DOE's statutory obligation to provide him with a FAPE. Apart from any contractual obligations with DOE, Pioneer has no independent obligation to provide I.M. with transportation.
Nor can Pioneer be held liable as a "service provider" under Education Law § 4402(7)(a) that "did nothing about" DOE's failure to provide Pioneer with a copy of plaintiff's IEP. According to the OPT representative's deposition testimony, DOE does not submit copies of IEPs to its transportation providers. Instead, DOE provides a code for each student indicating the type of transportation that it requires. Here, it is undisputed that with respect to plaintiff, DOE provided Pioneer with a code for a full-sized school bus (see also State Education Department Mem from Lawrence C. Gloeckler, dated May 2003 at 8 [DOE does not require school districts to provide bus drivers with copies of IEPs because they are "support staff" under Education Law § 4402(7)(c), not "service provider[s]" under Education Law § 4402(7)(a)]).
Accordingly, the order of the Supreme Court, Bronx County (Alison Y. Tuitt, J.), entered on or about March 7, 2017, which, insofar as appealed from, granted the motions of defendants DOE and Pioneer Transportation Company for summary judgment dismissing plaintiff's statutory claims against them, should be modified, on the law, to deny DOE's summary judgment motion dismissing plaintiff's claims under the Rehabilitation Act, the Americans with Disabilities Act and the New York State and City Human Rights Laws, and otherwise affirmed, without costs.
All concur except Tom, J. who dissents in part in an Opinion.




TOM, J. (dissenting in part)


Plaintiff's claims arise from his contention that he was improperly assigned to a large bus rather than to a minibus for a period of six weeks, during which time he exhibited misconduct on [*6]the bus, that the misbehavior was causally related to the incorrect bus assignment, and that he suffered various emotional and other harms as a consequence. I agree with the majority that the claims against the bus company should be dismissed and that the negligence claims against other defendants remain viable. I do not agree that the record provides a basis to support plaintiff's claim that the Department of Education and the individual defendants acted with the requisite intentionality or deliberate indifference to violate plaintiff's federal statutory rights under the Americans with Disabilities Act of 1990 (42 USC § 12132) or section 504 of the Rehabilitation Act of 1973 (29 USC § 794[a]). Thus, to this extent I respectfully dissent.
At the time of the 2005 events, plaintiff was a young child of kindergarten age, diagnosed with moderate to severe autism, with a history of some aberrant behaviors, including his removal of his clothing and sexual self-stimulation at home as well as in school settings and other public places. Plaintiff attended kindergarten in a special education school, P.S. 17X, in 2004-2005. He was transported to the school and then home in a full-size school bus along with other special education children. However, the Individualized Education Program (IEP) devised for plaintiff by the New York City Board of Education for school year 2005-2006 provided that plaintiff should be transported to and from school in a minibus, although no further explanation or instructions were provided in that regard. Defendant Joanne Richberg [FN1] was a member of the IEP committee, although she was clear in her deposition that she was not a member of the school administration and thus had no authority with respect to plaintiff's IEP, nor did she act as a teacher who would have had direct supervisory responsibilities for students during the time period relevant to this case.
During the relevant time period, the Department of Education's Office of Pupil Transportation (OPT) contracted with a private carrier, Pioneer Transportation Corporation, to provide transportation for special education children to school in the morning and home in the afternoon, as well as to assign matrons who would accompany the children on the bus. Pioneer operated full sized buses, which each carried approximately 30 special education students, but not minibuses, which usually carry between 10 and 14 special education students. OPT assigned the special education children, including plaintiff, to school buses, but the bus company was not responsible for compliance with a child's IEP. These buses transported only special education students, although they varied in age and in the nature of their disabilities. Plaintiff was placed on the available full-size buses for a six week period from September 13, 2005 to the end of October but not on a minibus, since none was provided,. OPT's acting director, Richard Scarpa, conceded that this could have resulted from human error.
The actual relevant time period for purposes of this action, however, are six days between September 20th and October 19th rather than six weeks. During this time period, the bus matron, Patricia Del Ponte, compiled student misbehavior reports relating to plaintiff. The report dated September 20, 2005 documented that plaintiff was disruptive on the afternoon bus in that he "was throwing his stuff around," took off his shirt and banged his fist on the window. The report dated September 21st related that on the afternoon bus plaintiff took off his shirt and sneakers and threw them; he also ate food on the bus, conduct that was not permitted. The report also described a bus "full" of students, many of whom were disruptive. The report further indicated that the matron could not exclusively watch plaintiff. The September 22nd report documented that plaintiff took off his shoes and socks, threw them on the floor of the bus and refused to put them back on, then he threw his book bag, and that he regularly banged on the bus window. The report dated September 30, 2005 made similar claims.
The report dated October 18, 2005 brought matters to a new level in that plaintiff took off his pants, jumped on the seat, took off his diaper and played with his genitals. On October 19, 2005, it was reported that he pulled his pants down to his ankles on the morning bus. Plaintiff was assigned a minibus the following day on October 20, 2005. If plaintiff continued to exhibit this behavior and defendant failed to act, an issue of deliberate indifference then might have been feasible. However, because defendants quickly took action after this most recent spate of behavior, we have no valid basis to reach that issue.
Generally, the boxes that were checked on these reports indicated that plaintiff annoyed or disrupted other students, which seems to have been the case. Nevertheless, this amounts to a total of six reports, four clustered during a week in September and two a month later, of some disruptions by a special needs student being bused with other special needs students, which do not themselves seem to flag the need for alternative transportation accommodations. Stated differently, there is no evidence that these behaviors were bus-related, or even that they were aberrational, since the record reflects that similar conduct occurred in the home. A letter affirmation dated August 15, 2014 submitted by Richard Perry, M.D., a Clinical Professor of child and Adolescent Psychiatry at New York University Medical School, who reviewed the relevant documents and deposition transcripts in this case, concluded that plaintiff's conduct was not triggered by the bus or else he would have been reluctant to even get on the bus. Dr. Perry noted that tantrums, masturbation in public and disrobing were typical of his behavior, and that sleep difficulties and/or anxieties over the start of the school year or other factors were more likely the causative elements. Dr. Perry also observed that during this time period plaintiff often rode the bus without this acting out. In any event, after October 20th, OTP granted the request that plaintiff be transferred to a minibus.
Plaintiff's father testified at his deposition that plaintiff often took off his clothes in the house when he came home from school, that he had done so on two or three occasions in school in 2004 prior to any incidents on the bus, and that his grandmother with whom plaintiff was then living told him about earlier occasions when plaintiff masturbated in school and in public places. Again, the record suggests that these recurrent behaviors occurred in contexts extraneous to whatever mode of transportation was employed for plaintiff. When plaintiff's psychiatrist was informed of these events he changed plaintiff's medication. Apparently, plaintiff also experienced sleep problems, awakening in the middle of the night during 2005 prior to the disturbances on the bus, also leading to a change of medication. The father had not made any complaints about plaintiff being on a full sized bus during the prior 2004-2005 school year, nor prior to October 2005 had he made any requests regarding plaintiff's transportation. To the contrary, there is no indication in the record that prior to these incidents, anyone had brought any incidents on any bus to the father's attention.
The very first incident on the bus of which the father was aware was in September 2005, when plaintiff took off his sneakers and socks and threw a sneaker out of the window. On that occasion, the father only requested that the window where his son was sitting thereafter be raised so that sneakers and socks, or anything else, could not be ejected from the bus. Even after the incident when plaintiff took off his clothes in the back of the bus, the father did not connect the incident to the size of the bus; instead, he continued to take plaintiff to the bus in the morning. However, he called OPT and related the incident and was told that it would be investigated.
On three of the occasions when plaintiff's misbeahvior on the bus was the subject of reports, the father spoke to Richberg. When the father requested to have plaintiff's bus changed, Richberg provided him with OPT's phone number, since only OPT had responsibility for transportation matters, but the father apparently never followed up with any such request. While one might fairly consider, in support of a negligence theory, whether Richberg should have taken further personal responsibility, there is no record evidence of any intentionally discriminatory [*7]conduct on her part nor even deliberate indifference that would have deprived plaintiff of any benefits on account of his disability.
Richberg's testimony provided insight into the protocols applicable under these circumstances. During 2005, as a unit coordinator for student transportation, she was also a "mandated reporter" requiring her to report to the Administration for Children's Services (at that time, the nomenclature was the Bureau of Child Welfare) any incidences of child abuse, physical abuse or educational neglect. Richberg testified that her responsibilities pertaining to transportation included checking that each child exited the bus at school in the morning and entered it for the trip home. If there were transportation issues that needed correction, such as late arrivals by a bus or if a driver or matron reported in writing student misbehavior, she would relate that to an assistant principal or the principal, and would notify the "pupil secretary," who would then contact the OPT. If a written report was provided by a driver or matron, Richberg would initial it, signifying her receipt, and then forward the report to an assistant principal. Richberg testified that she had taken such steps numerous times while previously assigned to that position. When shown the misbehavior reports relating plaintiff's misbehavior noted above, however, she disputed whether the initials that appeared were hers.
Richberg testified that a child's assignment to a smaller bus would be made on the basis of medical documentation from his or her personal physician as well as other forms required by the OPT, which would then make the decision. Teachers or other service providers were responsible for observing whether a child's IEP was adequate or, conversely, if a reevaluation was necessary, which would then be discussed with an assistant principal, who would also be responsible for determining whether a transportation aspect of the IEP needed modification. As unit coordinator, Richberg would also act as a conduit to an assistant principal in this respect. If a child was not assigned to a bus appropriate for his or her IEP, that information would be related to the pupil secretary who would inform OPT.
Richberg testified that on October 20, 2005, the principal, Lorraine Sesti, informed her about a note written by the father's girlfriend, a Ms. Watkin, on October 19th, relating that on October 18th plaintiff had been nude on the bus when it arrived at his home. Richberg had not previously been informed of such an incident and since the principal now had the information, it was no longer in the realm of Richberg's responsibilities, but she recalled that the principal had filed a report for purposes of investigating the matter. She had been unaware of prior reports. She also testified that she had never spoken to plaintiff's father or the father's girlfriend in connection with the incidents.
Yvonne Elaine Dixon was one of plaintiff's teacher's. She testified that one of her responsibilities was to maintain a log documenting conduct or needs for a student, which would regularly accompany the child home for the parents' review. She testified that plaintiff had been assigned a minibus for the 2005-2006 school year, either at the behest of a parent or an assistant principal or Richberg as the coordinator, but Dixon had little further information about the bus assignment. She noted that an assignment to a minibus would have been appropriate since it likely would have been calmer, and, with fewer students, possibly a shorter ride. Dixon testified that if an incident occurred on the bus, the driver or matron would relate that to Richberg as coordinator, who would then relay the information to an assistant principal, and Dixon, too, would be informed, who would record the incident in the child's log. On October 19, 2005, Richberg informed her that plaintiff had exited the bus with no clothes on; this was the only time of which she was aware. A note dated October 19, 2005, from plaintiff's stepmother, which also advised Dixon that the prior day plaintiff had been naked in the back of the bus, requested that plaintiff's belt in the future be tightened to prevent his removal of his pants, and indicated that her mother-in-law would request that the "bus company" put plaintiff on a smaller bus. Dixon testified that she would have turned the note over to the coordinator. On about five other [*8]occasions, Richberg informed her that plaintiff had been jumping up and down on the bus when he was happy, which was one of his behavioral mannerisms. This information was related to plaintiffs' parents.
Joanne Indiviglia was assigned as a matron to the bus on which plaintiff rode in mid-October, 2005. She wrote the misbehavior reports for October 17, 18 and 19th, which she described in more detail in her deposition testimony. After the incident on October 19th, Indiviglia reported the incident orally to Richberg. On October 20, 2005, plaintiff was picked up by a minibus in compliance with the IEP. 
As noted above, there is sufficient factual uncertainty in the record to support remanding for trial on a negligence theory. However, I conclude that on the facts as well as on the law, the federal statutory claims must be dismissed.
The Americans With Disabilities Act directs that a disabled person as defined in the Act may not "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" (42 USC § 12132). In similar language, section 504(a) of the Rehabilitation Act directs that no disabled person "solely by reason of her or his disability [may] be excluded from the participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ... " (29 USC § 794[a]). As noted by the Second Circuit, notwithstanding some textual distinctions, "the reach and requirements of both statutes are precisely the same" (Weixel v Board of Educ. of the City of New York, 287 F3d 138, 146 n6 [2d Cir 2002]), and the analysis often overlaps. Under each, the plaintiff must demonstrate that: (1) he or she is a qualified individual with a disability; (2) that the defendants are subject to these statutes; and (3) that he or she was denied the opportunity to participate in or benefit from the defendants' services, programs or activities or was otherwise discriminated against by the defendants, by reason of his or her disability; and, for the Rehabilitation Act claim, (4) that the defendant receives federal funding (Mrs. C v Wheaton, 916 F2d 69, 74 [2d Cir 1990]). In a special education context, the plaintiff must show that the defendants acted with bad faith or gross misjudgment (Congemi v Sachem Sch. Dist., 2017 WL 5508810, *8, 2017 US Dist LEXIS 217346, *22 [ED NY 2017, Jan. 19, 2017, No. 2:11-CV-01561(SIL)]; MC v Arlington Cent. Sch. Dist., 2012 WL 3020087, *10, 2012 US Dist LEXIS 103064, *41 [SD NY, July 24, 2012, No.11-CV-1835(CS)]).
Common to both of these statutes is the requirement of intentionality - that a plaintiff was intentionally discriminated against, and that the discrimination was a consequence of and directed against his or her disability. Since it is undisputed that plaintiff is disabled and defendants qualify within the meaning of the ADA and section 504(a) of the Rehabilitation Act, the issue presented for appeal concerns defendants' intentions in response to plaintiff's behavior. The ADA and Rehabilitation Act, by addressing intentional discrimination against disabled students rather than incorrect or erroneous special education treatments, in this sense differs from the Individuals and Disabilities Education Act (IDEA) (20 USC sections 1400 et seq.). IDEA addresses the provision of inadequate services for a disabled student which, without more, cannot support a claim of disability-based discrimination (French v New York State Dept. of Educ., 476 Fed Appx 468, 472-473 [2d Cir. 2011]]; Congemi v Sachem Sch. Dist., 2017 WL 5508810, *8 2017 US Dist LEXIS 217346, *21-22). Notably, plaintiff was not deprived of bus service; he was put on an incorrect bus for a period of time, which was inconsistent with his IEP, but the bus delivered him to school in the morning and returned him home in the afternoon, and the situation ultimately was corrected. Hence, plaintiff has not "specified any programs, activities or benefits from which [he] was excluded" (MC v Arlington Cent. Sch. Dist., 2012 WL 3020089, *10, 2012 US Dist LEXIS 103064, *41).
Plaintiff's theory is that Richberg's knowledge of plaintiff's misbehavior, and what seems [*9]to be a speculative link with the bus size, coupled with the failure to correct plaintiff's bus assignment earlier - that "for six weeks ... [s]he did nothing" - manifested "bad faith, gross misjudgment, gross negligence, deliberate indifference, or reckless indifference." This, in plaintiff's statutory construction, was tantamount to the necessary showing of intentionality. However, the premise is factually flawed in that these characterizations are not supported by the record, and, in any event, the legal standard is being misapplied. This record does not evince such a quantum of deliberate indifference as to equate with defendants purposefully depriving plaintiff of a service because of his autism.
Plaintiff, though, argues that "purposeful" discrimination need not even be established, and that intentionality can be inferred when a child is deprived of access to an educational service, such as busing, because of gross negligence or reckless indifference in the absence of discriminatory animus, and that the necessary standard is established by the present record. However, again, plaintiff was bussed; plaintiff speculates that the size of the bus led to his misbehavior, a characterization that seems conclusory on the basis of this record, but, again, there was no deprivation of an educational service. To the extent that plaintiff contends that he suffered emotional pain, that speaks to a negligence theory rather than disability, and not from a deprivation of an educational service on account of plaintiff's autism. Even where a disabled student was being regularly bullied on the bus and elsewhere by another student, coupled with allegations that school officials had been amply made aware of the conduct, the disabled student failed to establish the requisite intentionality in terms that the hostile conduct was causally linked with the plaintiff's disability for purposes of the ADA and section 504 of the Rehabilitation Act; the absence of nonconclusory facts establishing the necessary linkage required dismissal (Doe v Torrington Bd of Educ., 179 F Supp 3d 179 [ED Conn 2016]; Eskenazi-McGibney v Connetquot Cent. Sch. Dist., 84 F Supp 3d 221 [ED NY 2015]).
Plaintiff, citing to MC v Arlington Cent. Sch. Dist., also insists that intentional discrimination need not be motivated by animosity or ill will, but the distinction is irrelevant; animus and ill will are not demonstrably present in this case. Moreover, the court in MC rejected the defendant's unintentional human error as a basis for liability under these statutes and dismissed the action. Similarly, even where a child suffering a disability was deprived of appropriate educational services on the basis of error, the absence of "concrete evidence to support the assertion" that the deprivation manifested bad faith or gross misjudgment required summary judgment for the defendant dismissing claims under the Rehabilitation Act (C.L. v Scarsdale Union Free Sch. Dist., 744 F3d 826, 841 [2d Cir 2014]). Even if plaintiff could have established defendants' deliberate indifference in placing him on the larger bus and then being dilatory in reassigning him to a minibus, which I conclude is unsupported by the record, he still must link defendants' deliberate absence of diligent response to discrimination directed at his disability. Moreover, defendants did respond to the complaints and assigned plaintiff with a minibus, even if not as swiftly as plaintiff would have wanted, which undermines a claim of deliberate indifference (Doe v Torrington Bd of Educ., 176 F Supp 3d at 196, supra).
Although couched in terms of the need for further factual development, the majority necessarily endorses plaintiff's theory that liability under these statutes could be predicated on something well short of intentional discrimination that is solely directed at a person's disability. If this record is to be the basis for such an outcome, I think that such a holding risks the evisceration of the statutory standard. The statutory text specifically prohibits the wrongful "exclusion" of a child from covered services because of the disability, but plaintiff's theory in which the majority acquiesces may inappropriately open the door to lawsuits under these statutes that are in the realm of negligence rather than discrimination directed at a disability.
The majority cites to various decisions for the proposition that the requisite mental state can arise from bad faith or gross misjudgment in the administration of disability services. While [*10]I do not dispute the general proposition, the various cases relied on by the majority for that proposition present facts that are widely divergent from the facts before us and are manifestly inapposite. In J.L. v New York City Dept. of Educ. (324 F Supp 3d 455 [SD NY 2018]), the statutory violations arose from "a systemic breakdown in DOE's practices, policies and procedures governing the services it must provide to medically fragile children" (id. at 460). At the outset, that clearly is not the case here where transportation services to and from school, indeed, were provided without interruption. In J.L., one child who suffered seizures and other medical conditions was denied a bus nurse that the IEP required with the result that he missed two years of kindergarten. A second child, who was nonambulatory and suffered other conditions, required a bus nurse as well as wheelchair access to a school bus, but the family was frustratingly put through an ongoing bureaucratic maze over the course of three years during which their documentation was rejected and then accepted but lost, and they were then referred to other agencies, with the result that this child, too, was deprived of access to school. The IEP for a third child, a quadriplegic who also a wheelchair to access school and required a school bus that was wheelchair accessible, which he also was denied, and needed a bus nurse and school nurse at all times since he suffered seizures, whom he was also denied for a substantial time period, thereby depriving him of access to school. J.L. clearly has no bearing on the present case.
The majority also relies on R.B. ex rel. L.B. v Bd of Educ. of the City of New York (99 F Supp 2d 411 [SD NY 2000]) for the proposition that bad faith and gross misjudgment sustained the federal statutory claims when the Board of Education failed to implement the speech impaired and emotionally disturbed child's IEP requiring placement in a more structured private school setting after he was suspended from public school for an entire year; he received at-home instruction only towards the end of the school year. The majority also relies on Rutherford v Florida Union Free Sch. Dist. (2019 WL 1437823, 2019 US Dist LEXIS 55971 [SD NY 2019, March 29, 2019, No. 16-CV-9778 (KMK)]), where the autistic ADHD child also suffered from several other physical and emotional difficulties and was denied required counseling services for two years, leading to an exacerbation of his behavioral problems. He was often intentionally isolated from other students by school personnel, the school district declined to hire an appropriate counselor, the child started to return home bruised, but incident reports to the parents were irregularly provided, and a behavioral plan recommended by a behavioral analyst was not implemented. Other recommended counseling services also were not provided, with the result that the child was kept out of school for a time period and eventually was transferred to an out-of-district school, all the while being deprived of adequate mental and emotional intervention because of the declined services. In almost all respects, the child's IEP was not implemented. In each cases, these children were deprived of services required by their IEPs for extended time periods with the result that they were effectively denied access to educational services. Manifestly, these cases have no relevance to the uncontested facts of the present case for reasons already noted above.
Finally, the claims asserted under the New York State Human Rights Law (Executive Law § 296[2][a]) and the New York City Human Rights Law (Administrative Code of City of NY § 8-107[4][a]), even according those protections a more liberal construction than that applicable to the federal statutory claims, cannot overcome the fundamental defects discussed above and they, too, thus fail to present viable causes of action.
In conclusion, while there is sufficient evidence to raise the issue of negligence, the evidence relative to that remedy should not be conflated with the disability discrimination regime subject to the more exacting standards imposed under the ADA and section 504(a) of the Rehabilitation Act or even the City and State Human Rights Laws. Accordingly, I would affirm Supreme Court's order dismissing these claims.
Order, Supreme Court, Bronx County (Alison Y. Tuitt, J.), entered on or about March 7, 2017, modified, on the law, to deny DOE's summary judgment motion dismissing plaintiff's claims under the Rehabilitation Act, the Americans with Disabilities Act and the New York State and City Human Rights Laws, and otherwise affirmed, without costs.
Opinion by Moulton, J. All concur except Tom, J. who dissents in part in an Opinion.
Renwick, J.P., Tom, Singh, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: OCTOBER 29, 2019
CLERK



Footnotes

Footnote 1:A FAPE is guaranteed by the Individuals with Disabilities Education Act (IDEA) "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living" (20 USC § 1400[d][1][A]). A public education is appropriate when, inter alia, it is "designed to meet individual education needs of handicapped persons as adequately as the needs of nonhandicapped persons are met" (34 CFR 104.33[b][1]).

Footnote 2:An IEP is a school's written plan that is "reasonably calculated to enable the child to receive educational benefits[]" (Board of Educ. of Hendrick Hudson Cent. School Dist., Westchester County v Rowley, 458 US 176, 207 [1982]).

Footnote 3:Defendants moved for summary judgment dismissing plaintiff's claims for (1) discrimination; (2) negligence and gross negligence; (3) failure to report child abuse; and (4) violation of 42 USC § 1983. As is noted above, Supreme Court declined to dismiss plaintiff's negligence and gross negligence claims but dismissed plaintiff's claims for discrimination and for failure to report child abuse. Supreme Court also dismissed all claims against defendant Susan Erber. Supreme Court did not address or dismiss plaintiff's claim for violation of 42 USC § 1983.

Footnote 4:Lorraine Sesti was the principal of plaintiff's school. As discussed, infra, Richburg was the District Representative of the Committee on Special Education and the school employee who met the school buses. Plaintiff sued Joanne Richburg as J. Richberg.

Footnote 5:34 CFR 300.34(a) defines "Related Services" in relevant part as "transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education" (emphasis added).

Footnote 6:At her deposition, Richburg testified that she did not recognize her initials on several of the reports. However she also testified that it was possible that she initialed all but one of the reports because one report "definitely doesn't look like mine." In any event, even if Richburg did not initial all the reports, she testified that they were all forwarded to the school's administration.

Footnote 7:Indiviglia testified that while this report is dated October 18, 2005, it concerned I.M.'s October 17, 2005 bus ride home.

Footnote 8:I.M.'s teacher testified that she turned the note over to Richburg. Richburg conceded at her deposition that she spoke with the fiancée.

Footnote 9:I.M.'s teacher testified that Richburg told her on approximately five occasions that I.M. was jumping up and down in his bus seat, although she did not recall when Richburg informed her of this behavior.

Footnote 10:The IDEA contains an exhaustion requirement that is applicable to claims under the ADA and RA (see Scaggs, 2007 WL 1456221, *4, 2007 U.S. Dist LEXIS, *12-13). We reject DOE's contention that plaintiff's failure to pursue administrative remedies under the IDEA precludes recovery under the ADA or the RA. The primary reason for the exhaustion requirement is to promote the utilization of administrators who are familiar with resolving IEP content issues but the requirement is excused when, as is alleged here, the claim is based on the "failure to implement services already spelled out in an IEP" (2007 WL 1456221, *5, *6, 2007 US Dist LEXIS, *16, *18 [internal quotation marks omitted]). Here, plaintiff seeks compensatory damages, which would not be available under the IDEA given that the situation at issue was remedied long before the instant action. As such, pursuit of administrative remedies under the IDEA would be excused as futile (see MC v Arlington Cent. Sch. Dist., 2012 WL 3020087, *9, 2012 US Dist LEXIS 103064, *36-37 [SD NY, July 24, 2012, No. 11-CV-1835 (CS)]).

Footnote 11:DOE concedes that I.M. is a qualified individual with a disability and that it is subject to the ADA and RA. Thus, only the third prong is at issue here.

Footnote 12:The State HRL provides in relevant part that it is an unlawful discriminatory practice for any agent or employee of any place of public accommodation to "because of . . . disability . . . refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof" (Executive Law § 296[2][a]). 

Footnote 13:The City HRL provides in relevant part that it is an unlawful discriminatory practice for any agent or employee of any place of public accommodation to "[b]ecause of any person's actual or perceived . . . disability . . . refuse, withhold from or deny to such person . . . any of the accommodations, advantages, facilities or privileges [thereof]" (Administrative Code of the City of NY § 8-107[4][a][1][a]).

Footnote 14:Deliberate indifference is the "deliberate indifference to the strong likelihood [of] a violation" (Loeffler v Staten Island Univ. Hosp., 582 F3d at 275 [internal quotation marks omitted] [a reasonable jury could find that a hospital discriminated against a deaf patient and his family by acting with deliberate indifference in failing to provide the patient with a sign language interpreter]).

Footnote 15:Notably, the RA was intended to "rectify the harms resulting from action that discriminated by effect as well as by design" (Alexander, 469 US at 297). While DOE did not discriminate against I.M. by design, in that his IEP provided for the related service of a minibus, the effect of DOE's inactions, over a period of 29 days, was the same (see e.g. Loeffler v Staten Island Univ. Hosp., 582 F3d at 271, 275 [a reasonable jury could find that the hospital discriminated against a deaf patient and his family by failing to provide them with a sign language interpreter even though the hospital had a policy in place that provided for such interpreters]).


Footnote 16:Our dissenting colleague adopts DOE's argument that the record contains no evidence casually linking DOE's failure to implement I.M.'s IEP to his disability. Although DOE makes this argument in its appellate brief, it fails to provide a rationale other than maintaining that the evidence does not support a finding that it acted with deliberate indifference, bad faith, or gross misjudgment.

Footnote 17:Our colleague relies on two student bullying cases cited by DOE in its appellate brief. In Eskenazi-McGibney v Connetquot Cent. Sch. Dist., the Court held that the plaintiffs failed to state a claim under the RA and ADA because they did not provide facts to support a conclusion that the disabled student was bullied "because of" his disability, as opposed to "based on some other reason, such as personal animus" (84 F Supp 3d 221, 233 [ED NY 2015]). Doe v Torrington Bd. of Educ. (179 F Supp 3d 179 [D Conn 2016]) followed Eskenazi-Mcgibney. Because neither case involved a failure-to-accommodate claim they have no relevance to this appeal. 

Footnote 1:The name is spelled Richberg in the case caption, but Richburg in plaintiff's brief and in the deposition transcript.